FIELD *v.* JACK & JILL RANCH.

1. WORKMEN'S COMPENSATION — DUDE RANCH — POT WASHER — WRANGLING HORSES.

Plaintiff, a 16-year-old boy, who was hired as a pot washer at defendant's dude ranch, was performing a service which benefited defendant when wrangling horses from the pasture to the barn where they were prepared for the guests' breakfast rides and where such service was requested by the barn foreman because of shortage of help and plaintiff's injury while so engaged arose out of and in the course of his employment, notwithstanding his participation in such activity was without additional compensation and was enjoyed by him (CL 1948, § 412.1).

2. PRINCIPAL AND AGENT — AUTHORITY OF AGENT.

The authority of an agent includes not only those things he is expressly told to do, but those things which the principal knowingly acquiesces in being done by the agent.

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 58 Am Jur, Workmen's Compensation § 209 *et seq.*
[2] 2 Am Jur, Agency § 102.
[4, 5] 58 Am Jur, Workmen's Compensation §§ 152, 305.
[4, 5] Applicability and effect of workmen's compensation act in cases of injury to minors. 14 ALR 818; 33 ALR 337; 49 ALR 1435; 60 ALR 847; 83 ALR 416; 142 ALR 1018.

3. WORKMEN'S COMPENSATION—INJURY ARISING OUT OF AND IN COURSE OF EMPLOYMENT—HORSE WRANGLER AT DUDE RANCH.

Dude ranch owner's consent to use of plaintiff, a 16-year-old boy who had been hired to wash pots in the kitchen, as a horse wrangler, is fairly presumed, where it appears owner knew of the practice of using kitchen help for horse wrangling and took no effective measures to discontinue the practice, hence, where plaintiff was injured while so engaged, his injury arose out of and in the course of his "employment" (CL 1948, § 412.1).

4. SAME—MINORS—ILLEGAL EMPLOYMENT.

The workmen's compensation act does not define illegal employment of minors whereby they may be entitled to double compensation (CL 1948, § 411.7, as amended by PA 1949, No 284).

5. SAME—MINORS—ILLEGAL EMPLOYMENT—WORK NOT AUTHORIZED BY WORK PERMIT.

Work permit for plaintiff 16-year-old boy, which authorized his employment as a pot washer at defendant's dude ranch did not sanction his employment as a horse wrangler, hence, plaintiff who was injured while wrangling horses was illegally employed and entitled to double compensation (CL 1948, § 409.24, § 411.7, as amended by PA 1949, No 284).

6. INFANTS—WORK PERMITS—STATUTES.

The purpose of the act requiring work permits to be filed before minors are allowed to work is not only to protect them from hazardous employment but to regulate the terms and conditions of their labor in general (CL 1948, § 409.1 *et seq.*).

Appeal from Workmen's Compensation Commission. Submitted June 15, 1955. (Docket No. 24, Calendar No. 46,332.) Decided October 3, 1955.

Ronald Field presented his claim for compensation from Jack & Jill Ranch and The Travellers Insurance Company for injuries sustained while riding a horse. Award to plaintiff for double compensation because of his minority. Defendants appeal. Affirmed.

*Marcus, Kelman, Loria, McCroskey & Finucan* (*Jerry S. McCroskey,* of counsel), for plaintiff.

*Warner & Hart,* for defendants.

SMITH, J.  The plaintiff is Ronald Field.  At the time of the incidents described* he was a little over 16 years of age, working for defendant Jack & Jill Ranch.  This is described in the record as a "dude ranch."  It caters to vacationers interested in horse-back riding.  Plaintiff, however, was not hired for work in the barn, or with horses.  He was hired as kitchen help, more specifically for pot washing.  In this capacity he worked from 8 a.m. until noon, then he was off for 2 or 3 hours, when he returned and worked through the supper hour and until the supper dishes and utensils were cleaned.  On his day off (Sunday) he was allowed to use the recreational facilities of the camp and to have a 1-hour horse-back ride.

So far the facts are fairly well agreed.  The area of disagreement coincides with the area of the injury and prominent with respect thereto is the operation described as "wrangling."  The horses were pastured some little distance from the barn. Wrangling, "what it amounted to was just going down and when you rode behind the horses they would go and turn to the barn."  They were then brushed down, given their morning oats, and saddled for the guests' breakfast ride, which left the barn at 7 a.m.  The wrangling thus took place at an early hour.

On the morning in question plaintiff was engaged in wrangling.  His horse sidestepped into a post which struck him in the stomach, resulting in a rupture of the cortex of the kidney.  He was hospitalized for approximately 2 weeks, and thereafter suffered intermittently from cramps following upon heavy lifting.  Application for hearing and adjustment of claim resulted in a hearing before a deputy commissioner who denied compensation on the ground that plaintiff's injury did not arise out of

* September 12, 1951.

and in the course of his employment, in that he was voluntarily participating in riding. Upon appeal to the commission the award was reversed and plaintiff found to be entitled to compensation, doubled because of a finding of the illegal employment.* From the award of the commission defendants appeal upon leave granted.

Plaintiff, as we have seen, was employed as a pot washer. How, then, did he find himself engaged in wrangling? It is the position of defendants that plaintiff requested the additional riding for his own recreation and pleasure, because he, like the other employees, was "somewhat overcome by the glamor of the horses." Since it cannot be denied that the permission, if asked, was given, defendants go on to deny the authority of the agent to grant such permission, and to assert, finally, that the whole wrangling operation (as accomplished, on horseback) was unnecessary, since: "You could walk in the pasture and walk behind the horses and they would come in the barn." This latter the defendants direct to the point that no benefit accrued to the ranch from the wrangling operation, thus doubly riveting the point that only plaintiff's personal pleasure was involved.

The plaintiff's version differs markedly, in substance, in detail, and in emphasis. He asserts that he had been at the ranch only a matter of days when he was approached by one Tuck, who was then in charge of the barn. The barn foreman, Tex, was at that time in the hospital. Tuck, according to plaintiff, "had seen me riding and he just asked me if I would like to get in some extra riding because they were short of help and I could help wrangle if I'd like to." We note, in passing, that plaintiff testified that after Tex returned from the hospital

---

* See CL 1948, § 411.7, as amended by PA 1949, No 284 (Stat Ann 1950 Rev § 17.147).—Reporter.

he, Tex, also asked plaintiff to assist in the wrangling. There was no extra pay involved. "He said he (Tex) couldn't guarantee any pay for it," but there was a possibility, in the spring, that "I could have a job in the barn if I would have went back to work at the ranch." It seems clear from the record that plaintiff preferred horseback riding to washing pots and pans, and it is a reasonable inference that a barn job would have been more to his liking. Plaintiff was not the only kitchen helper, however, so favored as to wrangling. One Hamatree also assisted. "I (plaintiff) would wrangle one morning and he'd (Hamatree) wrangle the next, or I would wrangle 2 and he would wrangle 2." To go out wrangling it was necessary that plaintiff be awakened about 4:30 in the morning, which was accomplished by Tuck or Tex. It also appears from the record that, of those regularly assigned the task of wrangling (Tex, Baron, and Tuck, and sometimes Glenn) one (Tex) could not ride, because of a leg injury, and another (Baron) was favored in the wrangling because he had "to work on social activities at nights and he quite often stayed up for the dances and he wouldn't get to bed until possibly 1 o'clock or so." There thus seems to be corroboration for the statements made by Tex to plaintiff's mother and sisters that plaintiff was wrangling because "they were short of help."

As to the necessity for wrangling on horseback, we find nothing more than the suggestion that it "could" be done on foot. If it ever was so done, no such incident was described in the record. The usual and customary method appears to have been on horseback. That it was necessary to prepare the horses for the breakfast ride is not disputed, nor that the breakfast ride was one of the customary ranch privileges enjoyed by the paying guests. It cannot, then, be doubted that it was to the benefit

of the defendant Jack & Jill Ranch that the horses be prepared for the breakfast ride and the ride itself successfully accomplished. That the plaintiff enjoyed the additional work he was requested to do renders the task nonetheless a benefit to the employer. At the most it renders the act a benefit to both.

All of this, however, is legally immaterial, according to defendants' theory, because of fatal defect in the agency relied upon. The hierarchy of command at the dude ranch seems to have been from the owner, Mr. Storms, to James Day, the manager and ranch director, to the department heads. Mr. Day's duties were manifold: "I have full charge of all personnel, operation of the ranch, disbursements, purchasing, operation of the entertainment, sports and program," he testified. He was, himself, also the head of 2 departments, sports and social activities. Under him as manager, were the various departments and other department heads. Plaintiff's activities as a washer of pots and pans came under the steward's department, while his activities as a part-time wrangler came under the sports department. As to authority at the barn, there seems to be confusion in the minds of those most directly concerned. The manager asserted that it was Tex who was in charge "when Baron wasn't there." But Tex himself asserted that, as between them, "We were neither each other's boss."

It is unnecessary, however, that we pinpoint the exact shade of authority so far down the chain of command because of the situation at the top. As for the authority of Mr. Day, the general manager, it was comprehensive and not challenged in the record. He was to all intents and purposes the *alter ego* of the owner. Even without his unequivocal testimony it would be clear that his powers were prima facie coextensive with the business entrusted

to his care. *Grossman* v. *Langer,* 269 Mich 506. See, also, 1 Restatement, Agency, § 73. Clear it is, also, on plainest principles of agency, that the authority of an agent includes not only those things he is expressly told to do, but those things the principal knowingly acquiesces in his doing. The principal is liable in such case not on any principle of estoppel or apparent authority but because the agent is exercising authority that is as real and actual as though expressed in words. Here it is expressed in conduct, implied in fact. It is clear from the record that both the owner, Mr. Storm, and the manager, Mr. Day, knew that Tex received assistance from the kitchen help, and particularly from this plaintiff, in doing and having performed the duties of barn hands. The manager testified, referring to wrangling, not only at times by guests but by others of the staff: "Actually, it can happen, it has been done quite often and we have known it."

The knowledge thus obtained was not followed by measures effective to put an end to the practice, if, indeed, it was not encouraged, in view of the shortage of help and the time of day involved. (The plaintiff testified that he was called at around 4:30 in the morning for this work.) Thus it is that we find a 16-year-old boy, hired for washing pots and pans, engaged in the activity which resulted in his injury. The owner himself also knew that upon one occasion, described in the record, Tex had assigned plaintiff the job of "rear guide" for a trail ride—a job ordinarily performed by one of the barn hands. As to his approval or disapproval of such work assignment, we do not have his testimony, since he did not return from Miami for the hearing, but the record before us is silent as to rebuke, reprimand, or admonition, and his consent thereto may fairly be presumed.

The commission finding that "plaintiff's participation in wrangling was with the knowledge and consent and possibly even at the direction of the employer" was thus amply supported by competent evidence and is accepted by this Court. *Shaw* v. *General Motors Corporation*, 320 Mich 338. Likewise is its conclusion justified that "the work he was doing when injured was permitted and encouraged and conferred a benefit upon the employer." The work done by the employee in this instance, as has been noted, was for the benefit of the employer. That it was not distasteful to the employee, that it may, in fact, have been embraced eagerly by him, either from hope of relief next spring from the washing of pots and pans, or from sheer pleasure of horseback riding, renders it nonetheless a benefit to such employer. The injury clearly arose out of and in the course of the employment.

It remains to consider the matter of double compensation. The statute relating thereto provides as follows:

"Any minor under 18 years of age whose employment at the time of injury shall be shown to be illegal shall, in the absence of fraudulent use of permits or certificates of age, in which case only single compensation shall be paid, receive compensation double that provided elsewhere in this act." (CL 1948, § 411.7, as amended by PA 1949, No 284 [Stat Ann 1950 Rev § 17.147].)

It will be noted that the compensation act itself does not define illegal employment. For that we turn to the Hittle juvenile employment act (PA 1947, No 157 [CL 1948, § 409.1 *et seq.* (Stat Ann 1950 Rev § 17.701 *et seq.*)]), which regulates the employment of minors in this State. It is provided in section 3 thereof (CL 1948, § 409.3 [Stat Ann 1950 Rev § 17.703]) that a work permit must be ob-

tained for the employment of any minor under the age of 18 years.

"No minor under 18 years of age shall be employed, permitted or suffered to work in, about, or in connection with any gainful occupation, not excepted by this act, unless and until the person employing such minor shall procure from the minor and keep on file a work permit for each minor so employed."

The act further defines "legal employment" in section 24 thereof (CL 1948, § 409.24 [Stat Ann 1950 Rev § 17.724]) in the following terms:

"Any minor engaged in an occupation specified in a work permit issued for the employment of such minor. therein in accordance with provisions of this act shall be considered to be legally employed: Provided, That the employer has on file such work permit and the same has not expired or been revoked."

The defendants point to section 2 of the act, barring the employment of minors under 18 years of age "if such occupation is injurious to health or morals or is unduly hazardous," referring us to *Van Sweden* v. *Van Sweden*, 250 Mich 238, a case decided before the act under consideration was passed, and not here controlling, and argue, quite correctly, that the commission did not find the work to be hazardous. But defendants misconceive the issue at this point. The act does, it is true, bar employments which carry a physical or moral hazard to the child. But it does not stop here. The exploitation of children through the cupidity of avaricious parents or guardians, to the detriment of their health, education, and welfare, was for years a national disgrace. Even factory employment for the nimble fingers and small bodies of children of the age of 5 and 6 could be found by and for those

who were not squeamish. (Administration of Child Labor Laws, U. S. Department of Labor, Children's Bureau, Publication No. 133 [1924], p 2.)   The amelioration of such conditions came with the awareness of our people of the malodorous traffic, resulting in remedial State and Federal legislation.   The purpose of the act here under consideration was not only to protect our young from hazardous employment but to regulate the terms and conditions of their labor in general.   It is a beneficent law and we are not disposed to construe it in a frosty atmosphere or frustrate its purpose by a strict construction.   The plaintiff's work permit, which he turned over to his supervisor, was for washing pots and pans, not for wrangling horses.   His occupation was thus not sanctioned by his work permit (section 3), was therefore not legal under section 24, and the award of double compensation was properly made.

Affirmed, with costs to plaintiff.

CARR, C. J., and BUTZEL, SHARPE, BOYLES, REID, and KELLY, JJ., concurred with SMITH, J.

DETHMERS, J., concurred in the result.