CRILLY v. BALLOU.

1. WORKMEN'S COMPENSATION—PURPOSE OF ACT.

The workmen's compensation act rests upon the idea of status, not upon that of implied contract; that is, upon the conception that the injured workman is entitled to compensation for an injury sustained in the service of an industry to whose operations he contributes his work for the sake of wages as the owner contributes his capital for the sake of profits (CL 1948, § 411.1 et seq.).

2. SAME—PROXIMATE CAUSE—FAULT—NEGLIGENCE.

Workmen's compensation is not to be barred by fault, neglect or inattention of the injured workman.

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 58 Am Jur, Workmen's Compensation § 4.
[2] 58 Am Jur, Workmen's Compensation § 200.
[3] 58 Am Jur, Workmen's Compensation § 281 et seq.
[5] 58 Am Jur, Workmen's Compensation § 209.
[6, 7] 58 Am Jur, Workmen's Compensation § 268.
[8] 58 Am Jur, Workmen's Compensation §§ 152, 305.

3. Same—Damages—Earning Capacity.
   A workman under the workmen's compensation act may not get full "damages" as the term is used elsewhere in the law, but is limited to interference with earning capacity.

4. Same—Respondeat Superior—Course of Employment.
   Workmen's compensation does not involve the doctrine of *respondeat superior* and recovery in compensation cases does not turn on the common-law concept of scope of employment but upon the statutory requirement of course of employment.

5. Same—Proximate Cause.
   It must be determined that the hazard which gave rise to an injury for which workmen's compensation is claimed was one to which the employee was exposed because of his employment; the employer's knowledge, actual or constructive, his acquiescence or his condonation of sportive practices, not being essential to the compensability of an injury.

6. Same—Proximate Cause—Assault. .
   Workmen's compensation will not be denied an employee whose injury arose out of and in the course of his employment merely because he may have participated in sportive assault, provided the other requirements of the workmen's compensation act are satisfied.

7. Same—Course of Employment—Practical Jokes.
   The workmen's compensation act's concept of course of employment is more comprehensive than the assigned work at the place of employment, as it embraces the employee's ministrations to his own human needs, the way of life in a working environment, including the practice of playing practical jokes on his fellow employees.

8. Same—Minor Without Work Permit—Double Compensation.
   Plaintiff employee, who was nearly 17 years of age but working for roofing and siding contractor without a work permit as required by statute, when injured by a shingle thrown by another younger employee, *held*, entitled to double compensation for eye injury provided by the workmen's compensation act (CL 1948, § 409.1 *et seq.*; CLS 1952, § 411.7).

Dethmers, C. J., and Carr and Kelly, JJ., dissenting.

Appeal from the Workmen's Compensation Appeal Board. Submitted January 9, 1958. (Docket No. 32, Calendar No. 47,294.) Decided July 15, 1958.

Douglas Stephen Crilly, a minor, and Leo Francis Crilly, his guardian, presented his claim against Clarence Samuel Ballou, subcontractor and uninsured employer, Sam B. Wisdom, doing business as Wisdom Roofing & Siding, a subcontractor, the Travelers Insurance Company, Wisdom's insurer, and John Pinarelli, contractor, for compensation because of injury to eye received when he and coemployee were engaged in pranks during working period. From denial of compensation, plaintiffs appeal. Reversed and remanded for entry of award.

*William S. Plotkin,* for plaintiffs.

*Lacey, Jones & Doelle* (*Buell Doelle,* of counsel), for defendants Wisdom and Travelers Insurance Company.

SMITH, J. Once more we consider the great remedial statute, the workmen's compensation act. The case before us involves a boy of some 16 years. He and a teen-age friend had been employed by a contractor engaged in roofing and siding work. From time to time they would throw shingles and nails back and forth at each other. These acts, assaults in point of law, arose from youthful exuberance, rather than from vindictiveness, or animosity. Nevertheless, the last shingle thrown, put out the claimant's eye. He claims compensation. In opposition it is said that the injury did not arise out of and in the course of the employment.

We are here in the general area of the assault cases. The particular type of assault now before us is in the sportive assault. Its labels are as varied as the acts themselves. It is sometimes called fooling, or practical joking, horseplay, or larking. It knows no bounds of occupation or calling, or time, or location, as its very terminology reveals. Thus the lark-

ing of the English youths, when undertaken on the great ships of sail, with their towering masts so nearly scraping the sky itself, became "skylarking." Whatever the term employed, however, this particular kind of assault is, for the purpose of the social evils sought to be remedied by this act, governed by principles essentially similar to those applicable to the malicious assault. The workman blinded on the job by a fellow worker may console himself to some degree if the blinding were merely sportive, not malicious, but his family's loss of income recognizes no such distinction, nor does the economic burden necessarily assumed by charity, public or private, in the extreme cases. So far as sheer numbers is concerned, the weight of authority seems against recovery in this type of case. If, however, in the language of the chemist, we turn from a quantitative to a qualitative analysis the weight is squarely *contra*. The recent equal division of this Court in a case related in principle (*Stewart* v. *Chrysler Corporation,* 350 Mich 596, relying upon the aggressor rule of *Horvath* v. *LaFond,* 305 Mich 69) warrants our re-examination of the problem in its entirety.

The arguments against recovery in this type of case are well known. In the first place it may be said that the employee was not hired to throw shingles, or nails, but to work. (This is an ancient and now discredited argument originally made to refute the existence of the employment relation itself in actions seeking to hold the master for the torts of his servant. Compare *Limpus* v. *London General Omnibus Co.* [1862], 1 H & C 526 [158 Eng Rep 993], wherein it was said, per Wightman, J., dissenting [pp 536, 537], that "The defendants' coachman was not employed to obstruct or hinder the plaintiff's omnibus," with *Stillwagon* v. *Callan Brothers, Inc.,* 183 App Div 141 [170 NYS 677], a compensation case, where the court, in denying recovery, held

[p 143] that "He was not employed as a fighter; his work was driving the truck and helping to load it.") Since, then, the employee was not hired to throw things (nails, rolls, apples, hot ashes, or stones, to cite a few instances from the reported cases) if he was injured in so doing, it is argued that he was injured "outside the scope of his employment." Or, it is sometimes said, the injury received under such circumstances, arose from the workman's own fault, or, possibly, the fault of a fellow workman. At any rate, it was not the employer's. In other cases, it is pointed out that the injured claimant participated in the action, sometimes even started it. This being the case, it is urged, he must necessarily be denied recovery, otherwise he would profit by his own wrong. At times, indeed, the claimant is permitted to recover. In some such cases, the courts point out, the employer could foresee what was going to happen and did nothing. Or, it is pointed out in other cases, he knew of the goings-on and did nothing to stop them, hence, it might reasonably be said that there was an implication of authority so to act.

What is all this talk of fault, of negligence, of scope of employment, of foreseeability, of implied authority? We once lived in a paradise of these concepts, a veritable legalistic Garden of Eden, so completely out of touch with the realities of industrial life that those who came before us for succor, the halt and the blind, the victims of industrial accidents, were almost invariably turned away empty handed. It was the reaction of our people to these unrecompensed injuries that found expression in the workmen's compensation acts. A philosophy that is today no longer new demanded that the product pay its own way, that the human material consumed in its manufacture be purchased with the same coin as the coal and iron ore going into its production. "Workmen's compensation legislation rests upon the idea of status, not

upon that of implied contract; that is, upon the conception that the injured workman is entitled to compensation for an injury sustained in the service of an industry to whose operations he contributes his work as the owner contributes his capital—the one for the sake of the wages and the other for the sake of the profits."* Let the bench and bar ponder well, as our course of decision in this area in the past decades is reviewed, that the words quoted are those of Mr. Justice Sutherland, the year spoken was not 1958 but a quarter century earlier, 1923, and the court was the supreme court of the United States. The theory of the acts was clear: The consuming public, not charity, public or private, must foot the bill for work-incurred injuries. Compensation, moreover, was not to be barred by fault, or neglect, or inattention, that is, for the mere human failings of the workman. In short, no longer need the workman be free from fault to receive recompense. The family of the careless worker, as well as he more careful, knew privation and sorrow when injury stopped income. True, the injured workman would not get full "damages" as that term is used in the law. The amount of his recovery was carefully circumscribed. It was limited to interference with earning capacity. The workman might be so grotesquely disfigured as to shock even the insensitive, yet for this harm there was no compensation, unless aided by statute. He might, indeed, be so mangled as to have lost his sexual organs, but even eunuchs can work and, hence, under compensation laws he is entitled to nothing. *Smith* v. *Baker,* 157 Okla 155 (11 P2d 132). A jury, of course, might in either of these instances, as well as others, be persuaded to the contrary, but the workman has given up his common-

---

* *Cudahy Packing Company of Nebraska* v. *Parramore,* 263 US 418, 423 (44 S Ct 153, 68 L ed 366, 30 ALR 532), quoted in dissent of Black, J., in *Mack* v. *Reo Motors, Inc.,* 345 Mich 268, 272.

law action, and can no longer seek damages from a jury. However, there was a giving on both sides. In return for the workman's limited monetary recovery he got the certainty of adequate compensatory payments without recourse to litigation.

Such, at any rate, was the plan. It was a vain hope. For its relative failure the courts must assume a sobering responsibility. What our people, in their understanding, have attempted freely to give, we of the judiciary, in our tenacious adherence to inapplicable concepts of the common law, have in many cases withheld. Courts unfamiliar, or unsympathetic, with the broad humanitarian objectives of the act have permitted the retention, in its interpretation, of such tort and agency concepts as fault, authority (express or implied), foreseeability, knowledge, and scope of employment, the very concepts, in fact, that caused the breakdown of the common-law remedy in the first place and necessitated the passage of the act. They are completely out of harmony with its objectives. Thus we continue to flog the patient with the same whips that laid him low in the first place and "confusion and conflict"* reign in our minds and in our opinions as we wonder why he fails to recover his health.

So it is that we get to the assault cases, a type of case involving, just as clearly as in event of negligence, a degree of culpability, of fault, on the part of the workman, either the claimant himself, or his fellow workers. The earliest of the sportive assault (the fooling, or horseplay, or skylarking) cases denied recovery. Their reasoning reveals their misconceptions. Thus *Armitage* v. *Lancashire & Yorkshire R. Co.*, [1902] 2 KB 178 (71 LJKB 778, 86 LT 883), involved 3 boys. Two were larking. A third was hit in the eye by a piece of iron thrown by one of

---

* Rutledge, J., in *Hartford Accident & Indemnity Co.* v. *Cardillo,* 72 App DC 52 (112 F2d 11), *infra.*

the larking pair. Recovery was denied (p 181): "This was a wrongful act entirely outside the scope of the employment." Here, it will be noted, the court is falling back upon a concept (scope of employment) entirely foreign, both in origin and application, to the principles underlying the passage of compensation legislation. Scope of employment has its uses, it is true, in the application of the doctrine of *respondeat superior*. But compensation does not involve *respondeat superior* and recovery in compensation cases turns not on the common-law concept of scope of employment but upon the statutory requirement of course of employment. The 2 concepts have a different content. In fact, distinguished students of the subject have stated that, "perhaps the most important guide" for the interpretation of the expression "arising out of and in the course of his employment" is to "realize that it should be sharply differentiated from the technical phrase 'scope of employment' designed to circumscribe the area of vicarious liability to third persons."[*]

Early American cases were similar in result to the English case, *supra*. Recovery was denied with considerable uniformity, usually through the employment of tort or agency tests of liability. Thus in the oft-cited case (*Jacquemin* v. *Turner & Seymour Manfg. Co.*, 92 Conn 382 [103 A 115, LRA1918E, 496], an assault case) the opinion spoke of what the employer could reasonably have anticipated. Michigan in 1918 (*Tarpper* v. *Weston-Mott Co.*, 200 Mich 275 [LRA1918E, 507]) denied recovery to the victim of an air-hose (sportive) assault, relying upon certain then-recent cases which we will hereinafter examine in detail. Massachusetts (*Lee's Case*, 240 Mass 473 [134 NE 268, 20 ALR 870]) denied recovery in a sportive assault case, leaning heavily upon "scope

---

[*] Riesenfeld and Maxwell, Modern Social Legislation, p 234. See, also, p 139.

of employment." Such acts, it was said, had "no relation whatsoever to employment."

With the passage of the years, however, and as the act received the careful study of the bench and bar, the early rule of nonliability became riddled with exceptions so numerous and so out of harmony with the rationale of the earlier decisions that it became an open question how much, beyond a purely verbal residuum, of the earlier doctrines persisted. It remained for Mr. Justice Cardozo, in his famous opinion in *Leonbruno* v. *Champlain Silk Mills,* 229 NY 470 (128 NE 711, 13 ALR 522) (involving the playful throwing of apples), to break completely with the common-law concepts theretofore held controlling and to point out the statutory basis for liability under the act. He stated (p 472) that the claimant "was injured, not merely while he was in a factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life. The risks of such associations and conditions were risks of the employment." Likewise the penetrating analysis of Judge, later Mr. Justice, Rutledge, then on the court of appeals for the District of Columbia, in *Hartford Accident & Indemnity Co.* v. *Cardillo,* 72 App DC 52 (112 F2d 11), certiorari denied, 310 US 649 (60 S Ct 1100, 84 L ed 1415) (an assault case), aided in clarifying the problem. He then held, in part (pp 14, 15), that:

"Not the particular or peculiar character of the associations and conditions, but that the work creates and surrounds the employee with them is the basic thing.

"Nor is it necessary, as these cases show, that the particular act or event which is the immediate cause of the injury be itself part of any work done for the employer by the claimant or others. Otherwise no award could be given for many injuries now compensated, such as those caused by stray bullets, un-

explained falls, objects falling from outside the employer's premises and work, many street risks, horseplay, most assaults and many other causes. 'The risks of injury incurred in the crowded contacts of the factory through the acts of fellow workmen are not measured by the tendency of such acts to serve the master's business.' Not that the act is in the line of duty, or forwards the work, or creates special risks, but that the work brings the employee within its peril, makes it, for purposes of compensation, 'part of the work.' "

Other distinguished courts ruled similarly. Thus after many years of contrary holdings, the California court, in a case involving a bus girl injured in the right eye by a hard roll thrown by one young bus boy at another, held for compensability (*Pacific Employers Insurance Co.* v. *Industrial Accident Commission,* 26 Cal2d 286 [158 P2d 9, 159 ALR 313]). The closing paragraph of the opinion states its rationale:

"Considering, as we may, the propensities and tendencies of mankind and the ordinary habits of life, it must be admitted that wherever human beings congregate, either at work or at play, there is some frolicking and horseplay. Accordingly, an injury sustained by a nonparticipating employee through the horseplay of fellow workers arises 'out of' and 'is proximately caused by the employment' within the meaning of section 3600 of the labor code. The cases of *Coronado Beach Co.* v. *Pillsbury,* 172 Cal 682 (158 P 212, LRA1916F, 1164); *Fishering* v. *Pillsbury,* 172 Cal 690 (158 P 215); *Federal Mutual Liability Ins. Co.* v. *Industrial Acc. Com.,* 187 Cal 284 (201 P 920); *Great Western Power Co.* v. *Industrial Acc. Com.,* 187 Cal 295 (201 P 931); and *Pacific Emp. Ins. Co.* v. *Division of Ind. Acc. & Safety,* 209 Cal 656 (289 P 619), are overruled."

The *Secor Case* (*Secor* v. *Penn Service Garage,*
19 NJ 315 [117 A2d 12]) is also illustrative of the
modern trend of decision.   This was another case
involving an injury arising from a foolhardy, intend-
ed-to-be-playful act.   In affirming recovery the New
Jersey court held, in part, as follows (pp 319–321,
324) :

"The common-law concept of liability based on
fault is nowhere mentioned in the act and has no
proper place in its administration; on the contrary
the act is to be liberally applied as a compensation
statute intended to protect employees in the event of
work-related injuries notwithstanding their own neg-
ligent or even foolhardy conduct.   *   *   *   Similarly
the act nowhere either in terms or purpose, embodies
the common-law concept of proximate causation; on
the contrary it is enough if the employment is a
contributory cause.   See *Sanders* v. *Jarka Corp.,*
1 NJ 36 (61 A2d 641), where this court in sustaining
an award based on a criminal assault stated flatly
that the employment 'need not be the sole or proxi-
mate cause of the injury' and that the statutory re-
quirement is met if the employment is 'a contributing
cause to the accident' or 'a necessary factor' leading
to it.   *   *   *

"The statutory phrase 'by accident arising out of
and in the course of his employment' has no strict
common-law counterpart and courts have defined and
applied it with varying liberality.   In the oft-cited
case of *Bryant* v. *Fissell* (1913), 84 NJL 72, 77 (86 A
458), Justice Trenchard, in sustaining an award to an
injured workman, stated that a compensable accident
results 'from a risk reasonably incidental to the em-
ployment' and that an accident arises in the course of
the employment 'if it occurs while the employee is
doing what a man so employed may reasonably do
within a time during which he is employed, and at a
place where he may reasonably be during that time.'
See *Miller* v. *Bill Miller's Riviera, Inc.* (1952), 21 NJ
Super 112, 116 (90 A2d 889); *Schultz* v. *Henry V.*

*Vaughans Sons & Co., Inc.* (1953), 24 NJ Super 492, 498 (94 A2d 873). In *Belyus* v. *Wilkinson, Gaddis & Co.,* 115 NJL 43 (178 A 181), 116 NJL 92 (182 A 873), Justice Heher noted that an accident arises out of the employment when the risk is 'reasonably incident' thereto, and arises in the course of the employment when it occurs within the period of the employment at a place where the employee may reasonably be and while he is reasonably fulfilling the duties of the employment 'or doing something incidental to it.' See 1 Larson, Workmen's Compensation Law, p 193. Notwithstanding the sweep of these judicial definitions, the court in *Hulley* v. *Moosbrugger* (1915), 88 NJL 161, 169 (95 A 1007, LRA1916C, 1203), denied a compensation award to a nonparticipating victim of horseplay on the ground that his injury did not arise out of a risk reasonably incident to the employment. See, also, *Budrevie* v. *Wright Aeronautical Corp.* (1946), 135 NJL 46 (50 A2d 147), affirmed, 136 NJL 198 (55 A2d 10) ; *Savage* v. *Otis Elevator Co.* (1948), 136 NJL 419 (56 A2d 595). The great weight of authority is now to the contrary; indeed the trend has been toward allowing compensation even to participating employees where their deviations may be said to be minor and attributable to normal human tendencies which men do not wholly shed simply because they are at work.    *    *    *

"An employee is not an automaton, and, even when he is highly efficient, he will to some extent deviate from the uninterrupted performance of his work. Such deviation, if it be considered minor in the light of the particular time, place and circumstance, is realistically viewed by both the employer and the employee as a normal incidence of the employment relation and ought not in this day be viewed as legally breaching the course thereof. Fulfillment of the high purposes of our socially important and ever broadening workmen's compensation act suggests this approach and nothing in the statutory terms dictates any narrower position."

Cases similar in result and reasoning will be found in the footnote hereto* but we will not extend this opinion by quotations therefrom.

The Michigan cases in this particular area present an interesting array to the student of *stare decisis*. It is not unknown, in compensation law, that we tenaciously cling to precedents from other jurisdictions, long overruled in the States of their origin. Note the interpretation of the word "accident" in the case of *Hensey* v. *White,* [1900] 1 QB 481, 485 (69 LJQB 188, 81 LT 767), commented upon in dissent, *Wieda* v. *American Box Board Co.,* 343 Mich 182, 192. The *Hensey Case,* manifestly erroneous, had a life of only 3 years in England and had there been overruled for some 10 years prior to its embrace and adoption by us.† A similar situation is presented in the area of assault, sportive or malicious, now under examination. Our leading case in this field is *Tarpper* v. *Weston-Mott Co.,* 200 Mich 275 (LRA1918E, 507), denying compensation to the victim of a sportive assault. The case has been extensively cited and relied upon by us since its publication. It rested, not upon the force of its own reasoning, but upon 4 principal authorities from other jurisdictions. We will list them briefly, together with their fate in the jurisdictions of their birth:

(1) *Hulley* v. *Moosbrugger,* 88 NJL 161 (95 A 1007, LRA1916C, 1203). This case is one of those disapproved by the modern New Jersey court in the

---

* *Newell* v. *Moreau,* 94 NH 439 (55 A2d 476); *Dillon's Case,* 324 Mass 102 (85 NE2d 69); *State Compensation Insurance Fund* v. *Industrial Acc. Com.,* 38 Cal2d 659 (242 P2d 311); *Com'r of Taxation & Finance* v. *Bronx Hospital,* 276 App Div 708 (97 NYS2d 120); *Petro* v. *Martin Baking Co.,* 239 Minn 307 (58 NW2d 731); *Johnson* v. *Safreed,* 224 Ark 397 (273 SW2d 545). See, also, 1 Larson, Law of Workmen's Compensation, § 11.15(c), p 123, § 11.16(a), p 130, and 1957 Cum Supp, pp 17, 18.

† Note also our extended reliance upon the principle of *Thorogood* v. *Bryan,* 8 CB 115 (137 Eng Rep 452), after its repudiation in England and until *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697).

*Secor Case, supra,* as representing a view as to which the great weight of authority is now to the contrary;

(2) *Coronado Beach Co.* v. *Pillsbury,* 172 Cal 682 (158 P 91, LRA1916F, 1164). Overruled in *Pacific Employer's Insurance Co.* v. *Industrial Accident Commission, supra,* 287, upon, in part, the following rationale:

"The commission urges that the doctrine of *stare decisis* does not call for a perpetuation of the errors of past decisions. It declares that a 'frank reappraisal of the law,' particularly in view of the changes in the concepts regarding workmen's compensation since 1916, compels the conclusion that the holding in the case of *Coronado Beach Co.* v. *Pillsbury, supra,* should no longer be followed."

(3) *Matter of De Filippis* v. *Falkenberg,* 170 App Div 153 (155 NYS 761). This case is commented upon in *Matter of Ramos* v. *Taxi Transit Co.,* 276 App Div 101, 105 (92 NYS2d 744), as follows:

"There has been an interesting evolution in the view taken of injuries arising from sportive play and arguments between fellow workers during employment. The earlier rule was that injuries thus incurred did not 'arise out of' the employment. A classic example is *Matter of De Filippis* v. *Falkenberg* (170 App Div 153, *supra*), decided in 1915, where an injury to an employee caused by a scissors thrust through a partition by a fellow employee as a practical joke was held not compensable, reliance being placed on a long line of English cases.

"This might be compared with *Matter of Industrial Comr. (Siguin)* v. *McCarthy,* 295 NY 443 (68 NE2d 434), decided in 1946, over 30 years later. There a fatal injury arising from friendly horseplay was held to be compensable.

"The direction of this evolution, its guidance and its articulation, were largely fashioned by the expression of Cardozo, J., in *Leonbruno* v. *Champlain*

*Silk Mills* (1920), 229 NY 470 (128 NE 711, 13 ALR 522). Recognition was given, and impressed into judicial decisions, of the reality that it is to be expected as an integral incident to industrial work that there will be both fights and horseplay."

See, also, *Matter of Burns* v. *Merritt Engineering Co.,* 302 NY 131 (96 NE2d 739).

(4) *Federal Rubber Manfg. Co.* v. *Havolic,* 162 Wis 341 (156 NW 143, LRA1916D, 968). This case was overruled in *Badger Furniture Co.* v. *Industrial Commission,* 195 Wis 134, 138 (217 NW 734). "When the *Havolic Case* was decided," said the court with admirable candor, "the court had not had many cases under the compensation act before it."

We will observe, parenthetically, that the awakening of awareness of the social objectives of the act, together with the growing realization that it cannot function as intended if hobbled by judge-invented restrictions, is not confined to this country alone. The observations of Lord Wright, in *Noble* v. *Southern R. Co.,* [1940] AC 583, 600–602 (109 LJKB 509, 164 LT 1, 33 BWCC 176), are here in point:

"The fundamental and initial question in every claim under the act must be whether the accident arose out of and in the course of the employment. That is a question of fact which can only be decided by the county court judge by applying his common sense and his knowledge of industrial conditions to the evidence before him, though with due regard to any principles laid down by the courts. * * *
"I think it is true to say that as time has gone on the courts have taken a fairer and more common-sense view of the circumstances which justify an affirmative finding on this point. * * * This House * * * I think is not so ready as it was in the past to forget that it is simply construing a statute, or to import limitations and refinements for which the words of the statute afford no justification."

So much for the precedents upon which the *Tarpper Case* relied. So far as the reasoning of the later Michigan cases is concerned, the sportive assault received its most thorough examination in the case of *Glenn* v. *Reynolds Spring Co.*, 225 Mich 693 (36 ALR 1464). In view of the fact that the award of compensation was affirmed in this case it may properly be construed as a relaxation of the earlier *Tarpper* doctrine. Since the *Glenn* opinion relied, in part, upon the factor of the employer's knowledge of the "fooling" (NELSON SHARPE, J., in *Derhammer* v. *Detroit News,* 229 Mich 658, 660), and in further view of the suggestion of the highest New York court in 1948 (as well as other courts) that before recovery could be had, in a sportive assault case, the practice must have been of such long-standing duration that it had become a custom of the business,* we may be justified in devoting some attention thereto.

It is from the establishment of the custom that the courts find knowledge of, and toleration (or "condonation") of, the sportive practice by the employer. But to what end? What is its legal significance? The light shed upon course of employment by the employer's knowledge of a questioned act is slight indeed, if, in fact, existent. But the knowledge of the employer does bear directly upon his possible negligence in permitting the acts to continue, and, if knowledge of a commonly-known fact, bears upon the employee's assumption of risk in working under such conditions, upon the negligence or lack thereof of his fellow workers, and upon the scope of employment.† These, of course, are the very defenses this act was intended to abolish. As Mr. Justice Elkus observed in *Matter of Verschleiser* v. *Joseph Stern & Son,* 229 NY 192, 198 (128 NE 126), to require that the employer have

---

* *Ognibene* v. *Rochester Manfg. Co.*, 298 NY 85 (80 NE2d 749); cf., *Hayes Freight Lines* v. *Burns* (Ky), 290 SW2d 836.

† 1 Restatement, Agency, § 229.

knowledge of one's propensities to assault others (as a condition to compensation) "is a retrogression to the old master and servant law and clearly against the intent of the workmen's compensation law which does not look for fault." The first bite, under this theory, is free. Not until the second is blood drawn, for not until then, at the earliest, is the propensity established. These observations seem to be as applicable to the sportive assault as the malicious assault.

But a criticism equally serious pertains to the kind or degree of employer knowledge required. Must it be actual knowledge? Or will we get into the realm of fictions and require merely "constructive" knowledge? And knowledge of what? Knowledge of the particular occurrence? Or knowledge of human playfulness or combativeness? As a matter of fact we are dangerously close to a complete lack of realism in the requirement that the sportive or malicious assault must have become a custom before injuries received therefrom are compensable. The books contain many of the "air-hose" cases, the situation in which a fellow worker is "goosed" with a shot of compressed air.* Under some circumstances the victim suffers ruptured intestines and dies in agony. It is difficult to picture such attacks as becoming so repetitive, so well known, and so commonly accepted in any plant as to rise to the dignity of a "custom." If it cannot so rise, and yet we demand proof of a "custom," we have simply held, through a verbal formula, there shall be no compensation. Of course, if acts are a custom of the business there can be no doubt that the injury has the requisite work connection. But this is far from saying that there must be proof of a custom before we can have compensation.

---

* E.g., *Federal Rubber Manfg. Co.* v. *Havolic*, 162 Wis 341 (156 NW 143, LRA1916D, 968); *Tarpper* v. *Weston-Mott Co.*, 200 Mich 275 (LRA1918E, 507); *Hazelwood* v. *Standard Sanitary Manfg. Co.*, 208 Ky 618 (271 SW 687).

With respect to compensation, as distinguished from tort damages, we are concerned with the day-by-day operation in all of its aspects, and the employer's knowledge or lack of knowledge of an operation does not control whether or not it is an incident of the business. If the employer is indisposed, remote from the operation, engrossed in other affairs, even enjoying a well-earned respite in the Caribbean, will there be a suspension of compensation for operations developed in his absence, or their natural concomitants? This is not a critical line of inquiry under compensation law. We look, rather, at the hazard from which the injury arose and ask whether or not the claimant's exposure thereto resulted from his employment. The employer's knowledge, actual or constructive, his acquiescence, his condonation, are not essential to the compensability of an injury under our statute.

We might place decision in the case before us upon grounds so narrow as to leave remaining doubt whether in this jurisdiction the tort and agency concepts rejected by the act were still controlling in truth. There is evidence here that the employer had knowledge of the play that was taking place between these 2 boys while on the job. For reasons hereinabove set forth in detail, this rationale we reject. We might also place decision on the ground that when struck the claimant was what has been called in the cases a nonparticipating victim of the sportive aggression of his companion. ("Wozniak was cleaning up around the cutter and throwing pieces of shingles downstairs or out of the window; that one of the pieces struck plaintiff in the right eye as he was returning to the second floor.") The difficulty with the aggression approach is twofold: First, as a matter of judicial administration it leads into interminable litigation as to the proper identification of the aggressor. (Note the careful analysis of this

problem by Mr. Justice BLACK in *Stewart* v. *Chrysler Corporation,* 350 Mich 596, 600, 601.) Is name-calling aggression? Yes, said *Kimbro* v. *Black & White Cab Co.,* 50 Ga App 143 (177 SE 274). No, said *York* v. *City of Hazard,* 301 Ky 306 (191 SW2d 239). How about one who "advances upon" another, carrying a shovel? Is seizure of the shovel by the other an act of aggression? *Gilyard* v. *O'Reilly,* 4 La App 498, said it was, and compensation was awarded him who advanced. Suppose a young female waitress attempts (with no clear-cut proof of success) to slap the face of a chef weighing over 200 pounds and over 6 feet in height and he responds with such violence that her spine is seriously injured. (*Martin* v. *Snuffy's Steak House,* 46 NJS 425 [134 A2d 789].) Was her possibly abortive blow an act of "aggression"? Suppose he cursed her first? If it had been intended by the legislature that the award of compensation depend upon such considerations it is inconceivable that the act would be (as it is) utterly silent with respect thereto, leaving us without guide or standard. The supreme court of California (*State Compensation Insurance Fund* v. *Industrial Accident Commission,* 38 Cal2d 659 [242 P2d 311]), recently quoted with approval a substantial part of the decision of Judge Rutledge in *Hartford Accident & Indemnity Co.* v. *Cardillo,* 72 App DC 52 (112 F2d 11), in which the court had refused to enjoin the enforcement of an award of compensation in an assault case, with the following comment (pp 667–669):

"The modern trend is in accord. (Citations omitted.) Many writers on the subject have taken the same position (Assaults and Horseplay under Workmen's Compensation Laws, Samuel B. Horovitz, 41 Ill L Rev 311; Current Trends in Workmen's Compensation, Samuel B. Horovitz [1947], p 532). In the above writings Mr. Horovitz ably presents the problem. At page 343 *et seq.* of 41 Ill L Rev he

says: 'Why should it make any legal difference under the compensation law whether the injured party was the aggressor? Certainly, no compensation statute expressly gives the employer the defense of "aggressor." * * *

" 'Many assaults result from impulsive, thoughtless or unintentional acts, often trivial in origin, although the result may be serious or even fatal. The "explosive point is merely the culmination of antecedent pressures" in many instances. A worker tells his foreman he wishes to quit the gang and that the foreman is prejudiced against him. One word leads to another, and fists fly. *To create an artificial rule* that he whose fist first made contact is an aggressor (and can never recover, even though the first fist did no harm, whereas the second fist permanently injured the fellow worker), *is to forget the legislative command that injuries arising out of the employment be compensated, short of wilful misconduct or similar provisions.* And where the quarrel had its origin in the work or work-environment and was short of wilful misconduct, or short of any express defense in the act, *how can the court justify their own judicially-created defenses?* "

The second difficulty with making compensation turn on lack of aggression is even more serious. Two men are fighting in a plant, or there is horseplay between them. Each is injured in the same way, to the same degree. Each applies for compensation. It is granted, let us say, to A, the nonaggressor. This means, necessarily, that his injury arose in the course of and out of his employment. If it is denied to B (save because of specific statutory prohibition) we necessarily say that his injury was *not* received in the course of and out of his employment. It was the same incident, the same plant, the same injuries, yet one man, we find, has a compensable injury, although not the other. The court has said to B, you cannot recover because you started it, you were the

aggressor, it was your fault. Thus fault once more prevents compensation for industrial injury and we have turned back the hands of the clock nearly a hundred years. Before permitting the fault concept such overriding power it would be well to remind ourselves that it is not a law of nature, like the law of gravity. The theory that "fault" forms the basis for tort recovery came into the law, according to Dean Pound,[1] through a combination of ethical considerations and the metaphysical theory of the free will. The utility of the fault theory of tort liability under modern conditions is, indeed, open to the most serious question.[2] However that may be as to tort recovery, a court which today insists upon making fault the criterion of workmen's compensation is committing an error differing in degree only from that of the learned court of a half-century ago which declared the first compensation law unconstitutional because, in part, it imposed liability without fault.[3] It is clearly beyond our competence, as judges, to continue to insist that we will not award workmen's compensation to workmen who are at fault with respect to the injuries of which they complain, specifically (in the context in which we are now writing) that we will not approve an award to the aggressor, whether malicious[4] or sportive, provided the other

---

[1] An Introduction to the Philosophy of Law, Yale University Press (1922).

[2] Harper and James, The Law of Torts, chapter 12.

[3] "Under this law, the most thoughtful and careful employer, who has neglected no duty, and whose workshop is equipped with every possible appliance that may make for safety, health and morals of his employees, is liable in damages to any employee who happens to sustain injury through an accident which no human being can foresee or prevent, or which, if preventable at all, can only be prevented by the reasonable care of the employee himself." *Ives* v. *South Buffalo R. Co.*, 201 NY 271, 302 (94 NE 431, 34 LRA NS 162, Ann Cas 1912B, 156).

[4] To be distinguished from the term "malicious" as here employed are those acts of such gross and reprehensible nature as to constitute intentional and wilful misconduct under the act. See discussion, *infra*, citing *Federal Underwriters Exchange* v. *Samuel*, 138 Tex 444 (160 SW2d 61).

requirements of the act are satisfied. The act itself contains no mention of aggression as a defense to payment of compensation. It is judge-invented, having its origin with the inapplicable tort concepts, and should be judge-abolished. This type of fault should not defeat compensation any more than the faults of inattention or carelessness. They are blood brothers.

The assault cases are, in a sense, merely a thread in a great tapestry. The larger area involves all of those series of acts (and there are many, such as getting a drink, going to the toilet, and like concessions to human needs, instincts and desires) which, in and of themselves, the workman was not hired to perform. If it is permissible to consider one of such acts alone, by itself, isolated from its surrounding circumstances, divorced from what went before and what comes after (defined, in short, as the Missouri farmer defined his mule, "an animal without pride of ancestry or hope of posterity"), then, literally, the employee was not hired to perform it. In so doing he stepped aside from his employment, no longer worked for the employer, went off on a frolic of his own (to use the language of the detour cases), and became, for the moment, unemployed, on no one's payroll, not a workman, and obviously not entitled to compensation if injured. Hence, that series of cases, now of questionable validity (see 1 Larson, Workmen's Compensation Law, § 21:00 *et seq.; cf.,* Mack v. Reo Motors, Inc., 345 Mich 268, dissent, 270, per BLACK, J.), holding that injuries received in the course of such activities are noncompensable.

The fatal defect in the reasoning of these cases is their lack of appreciation of the purpose of the act, the plain content of its words, and its great humanitarian objectives. Labor is not a commodity. Labor is people, men, women, and, as this case so tragically shows, children. They have great virtues,

for they are made in God's image, but they have grievous faults, for they are far from perfect. They quarrel, they fight, they are sometimes abusive, even profane. They are hired to work, and work they do, as our industrial might attests. Yet they work not always carefully, for they are heedless, not always with a single-minded devotion to duty, for they are thoughtless. There was a time when employers could say to an injured employee, I hired you to be careful, not careless. I hired you to work, not to fight, or play. I hired the best in you, not the worst. I hired the good, not the evil. I hired the virtue, not the vice. Such sophistry was, for a time, accepted. It was true that the boy in Mr. Justice Cardozo's case (*Leonbruno, supra*) was not hired to throw apples, any more than the boys before us were hired to throw shingles. But what was hired, a boy or a robot? The answer is simple and it points to our solution: the employer hired a human being, with all his reactions and his imperfections. Going to the job does not sanctify him. At home or at work, give a man a curse and he will anger, give a teen-age boy an apple core and he will throw it. The workman "brings to his work," as we said, dissenting in *Salmon* v. *Bagley Laundry Company*, 344 Mich 471, 487, "all of his human characteristics, his frailties as well as his virtues. We cannot, either actually or legally, make the precise excisions of the surgeon. We cannot remove from him, and put to work for his employer, only his strength. His strength goes hand in hand with his temper. It is impossible for us to employ only the grace and charm of the female worker. We hire as well her lively curiosity. We collect these people by the hundreds, even thousands, and we put them to work, sometimes amid noise and vibration, sometimes in smoke and steam. They get tired. They get hungry. They get thirsty. They have to go to

the toilet. The day wears on and tempers grow short. Relief is sought in horseplay. Trips to the water cooler and coffee urn grow in number and duration. This is the course of employment. 'Course of employment' is not a sterile form of words. It is descriptive of life in the industrial age. These human deviations from the course of the automaton do not suspend the employer-employee relationship. They are not departures from employment, but the very substance of it. They are the inevitable concomitants of the working relationship and conditions which produce the product. Its costs must reflect the fatigue, the irritations, and sometimes the blood that went into it. It is here that we find the explanation for the horseplay cases, the curiosity cases, and the assault cases."

Herein lies our answer. For the purposes of the compensation act the concept of course of employment is more comprehensive than the assigned work at the lathe. It includes an employee's ministrations to his own human needs: he must eat; concessions to his own human frailties: he must rest, must now and then have a break, and he sometimes, even on the job, plays practical jokes on his fellows. Course of employment is not scope of employment. The former, as the cases so clearly reveal, is a way of life in a working environment. If the injury results from the work itself, or from the stresses, the tensions, the associations, of the working environments, human as well as material, it is compensable. Why? Because those are the ingredients of the product itself. It carries to the market with it, on its price tag stained and scarred, its human as well as its material costs. So says the statute. It does not become us to ignore its plain commands.

We need not undertake to define the outer limits of compensability. We rule on the case before us. The requirement that there be a causal connection

between the work, or the incidents thereof, the working conditions, and the injury, serves to exclude the purely personal, nonwork connected, disputes, such as that which arose after one Harry Elrod attempted to "date" the wife of a fellow workman whom he had met in a tavern the night preceding the altercation. *Elrod* v. *Union Bleachery,* 204 SC 481 (30 SE 2d 73). Excluded, also, under the terms of the statute are acts of such gross and reprehensible nature as to constitute intentional and wilful misconduct* (CL 1948, § 412.2 [Stat Ann 1950 Rev § 17.152]). This presents a situation of an entirely different character than that presented by the playful shove or the roundhouse punch, no matter how tragic may be the latter's unexpected results. And this exclusion of acts of a degree of moral turpitude, it will be observed, is by the legislature itself, not a judicial retrogression to principles of tort. Further than this in definition we do not attempt to go. The precise future line of demarcation will be marked out, in the traditional manner, by the case-to-case decisions.

So much for the present and the future. As for the past, we specifically overrule the *Tarpper Case* (*Tarpper* v. *Weston-Mott Company,* 200 Mich 275 [LRA1918E, 507]), and subsequent cases of like character, and hold that injuries received in assaults, either sportive or malicious, are not, by reason of such fact alone, beyond the realm of compensability. If arising out of the employment and received in the course thereof they are compensable.

It is conceded that the employment of plaintiff Douglas Crilly was without the work permit required for the employment of minors. (PA 1947, No 157 [CL 1948, § 409.1 *et seq.* (Stat Ann 1950 Rev § 17.701

---

* *Federal Underwriters Exchange* v. *Samuel,* 138 Tex 444 (160 SW 2d 61), wherein assailant-claimant armed himself with iron bar and knife and attacked coemployee.

*et seq.*)].) The provisions of section 7 of the compensation act (CLS 1952, § 411.7 [Stat Ann 1950 Rev § 17.147, as amended by PA 1952, No 77]) are therefore applicable.

We need not repeat our analysis of such employment found in *Field* v. *Jack & Jill Ranch,* 343 Mich 273, 280.

The order of the workmen's compensation appeal board is reversed and the cause remanded for entry of an order in accordance herewith. Plaintiff may have costs.

BLACK, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

CARR, J. (*dissenting*). The question at issue in this case is whether the injury for which Douglas Crilly, herein referred to as the plaintiff, seeks compensation arose out of and in the course of his employment. On July 9, 1953, plaintiff and Arthur Wozniak were employed by defendant Ballou, who was a subcontractor on a roofing and siding job in East Detroit. At the time Douglas was nearly 17 years of age, and Arthur was somewhat younger. Apparently they had been acquainted for some time. On the occasion in question they were inside the building on which they were working, cutting shingles for use by their employer who was working on the outside. While so engaged they began throwing pieces of asbestos shingles, and possibly other missiles, at one another. They had previously engaged in such conduct and had been warned by their employer not to do so.

Apparently no one other than the 2 boys was in the building at the time, or in position to see what was occurring. According to the testimony of Arthur on the hearing before the referee, the conduct referred to continued for some time, but less

than a half hour. Finally Douglas was struck in the eye and in consequence suffered the loss of industrial vision therein. Following the event both boys concealed for some time the manner in which the injury had been sustained.

The hearing referee concluded from the testimony before him that the injury suffered by plaintiff did not arise out of and in the course of his employment. Accordingly an order was made denying compensation. The appeal board sustained the decision of the referee, specifically finding that plaintiff and his companion were engaged in horseplay which resulted in the injury, and that such conduct had not been condoned by their employer who had warned and instructed them against it. The board concluded that "Douglas Crilly did not receive a personal injury arising out of and in the course of his employment."

On leave granted plaintiff has appealed to this Court, claiming in effect that notwithstanding the factual findings of the appeal board he is entitled to compensation. Whether such claim is well founded depends on the interpretation given to provisions of the compensation act.* The mere fact that one suffers an injury on the premises where he is employed is not sufficient to establish his right to compensation. Presumably it was with such thought in mind that the legislature specifically provided for the payment of compensation in instances where the injury was one "arising out of and in the course of his employment." CL 1948, § 412.1 (Stat Ann 1950 Rev § 17.151). The next section of the act expressly denies compensation to an employee "injured by reason of his intentional and wilful misconduct" (CL 1948, § 412.2 [Stat Ann 1950 Rev § 17.152]). The statute was enacted for the protec-

---

* PA 1912 (1st Ex Sess), No 10, as amended (CL 1948 § 411.1 et seq., as amended [Stat Ann 1950 Rev § 17.141 et seq., as amended]).

tion of employees and in the interest of the general welfare, but its application may not be enlarged beyond the limitations expressed by the legislature. We have the compensation law because of the action of the law-making department of the State government. This Court is limited to the duty of construing the expression of the legislative will in accord with the specific language used and applying it accordingly.

In prior decisions this Court has declined to construe the Michigan act as authorizing the payment of compensation to one who is injured as a result of "horseplay," even though the one so injured was not a participant. *Tarpper* v. *Weston-Mott Co.*, 200 Mich 275 (LRA1918E, 507); *Steffes* v. *Ford Motor Co.*, 239 Mich 501; *Jones* v. *Campbell, Wyant & Cannon Foundry Co.*, 284 Mich 358. Counsel for plaintiff calls attention to *Glenn* v. *Reynolds Spring Co.*, 225 Mich 693 (36 ALR 1464), in which an award of compensation was upheld to a victim of a joke played on him by his fellow employees. It was said in the course of the discussion that (p 694):

"It is well settled in this State that to justify an award under our act the accident must have arisen, not only in the course of employment, but *out of the employment.*"

It appeared in the above case that Glenn was employed as a sweeper, using his wheelbarrow in the collection of refuse. Two men, who were subsequently convicted of manslaughter, attached electric wires to the handles of the wheelbarrow, as a result of which Glenn received a shock causing his death. A "straw boss" was aware of the horseplay going on among the employees, and at times participated in jokes that were played. He had authority to stop such conduct but did not do so. This Court concluded that because of the unusual facts the innocent

victim of the horseplay was subjected to a hazard unknown to him but of which his employer was charged with notice, and that, in consequence, there was such a causal connection between the conditions under which his work was performed and the fatal injury received as justified the award made by the compensation commission.

The facts in the case at bar are not analogous to those in *Glenn* v. *Reynolds Spring Co., supra.* Here the plaintiff was a willing participant in the course of conduct that resulted in his injury, which conduct had been continued for several minutes at least prior to his being struck in the eye. These boys were not children. They were of sufficient age and understanding as to be capable of doing the work for which they were hired. They had been warned by their employer to refrain from throwing missiles at one another, but while the employer was working where he could not constantly observe them they disobeyed the instructions given. They were of sufficient age and understanding to realize that serious injury might result from their acts. Nonetheless, in a spirit of apparent recklessness, they continued to throw missiles at one another.

Significant in this connection is the provision of the statute, above noted, denying compensation to an employee injured by reason of his intentional and wilful misconduct. The acts of these young men were deliberate and intentional. In view of the warning that they had received and the knowledge of the danger inherent in their conduct, the conclusion is fully justified that they acted wilfully. In *Waldbauer* v. *Michigan Bean Co.,* 278 Mich 249, an award of compensation was vacated by this Court, the established facts showing that the employee had deliberately risked death by gas poisoning and in disregard of regulations concerning the use of said gas imposed by the employer. The statute was

deemed a bar to compensation although obviously Waldbauer was at the time acting in the course of his employment.

In the instant case plaintiff and his companion, in engaging in the course of conduct that resulted in serious injury to plaintiff, were not engaged in performing their duties as employees or otherwise serving the interests of the employer. On the contrary, they were doing what they had been forbidden to do. The specific provision of the Michigan statute providing for compensation for injuries received in the course of and arising out of the employment may not be construed as applicable under the facts in the instant case. While plaintiff and his companion were throwing missiles at one another they were not in the course of their employment, nor may it reasonably be said that such conduct arose therefrom. No claim is made that the throwing of missiles at one another by employees engaged in the kind of work in which these young men were employed is customary. In other words, such conduct may not be considered as incidental to employment of the character in question.

The case of *Lauscher* v. *Montgomery Ward & Company, Inc.*, 327 Mich 358, involved the question whether the injury sustained by an employee arose out of and in the course of his employment. Said employee was directed to remove a drum containing an antifreeze mixture to the defendant's warehouse. Such removal was the extent of his duty. However, he proceeded to empty the drum in an alley, and to set fire to the liquid. He had been given express instructions not to light fires but, as in the case at bar, violated such instructions. The injury, which proved fatal, resulted from an explosion of the inflammable liquid. An award of compensation to the widow and minor child of the employee was

set aside on the ground that, under the provisions of the statute, compensation was not payable.

In the instant case the factual findings of the appeal board, on the basis of which compensation was denied, were fully supported by the proofs taken before the referee. By such findings this Court is bound. CL 1948, § 413.12 (Stat Ann 1950 Rev § 17.186). The situation presented is somewhat unusual. The question is whether an employee who deliberately and intentionally participates in a course of conduct that may result in injury, in violation of the specific instructions of his employer, is entitled to compensation under our statute. Attention has been called to decisions from other States in which nonparticipants in so-called horseplay have been held, under the particular circumstances involved, and pertinent statutory provisions, entitled to such compensation. Among such decisions is *Leonbruno* v. *Champlain Silk Mills,* 229 NY 470 (128 NE 711, 13 ALR 522), frequently cited by text writers and courts. There the claimant for compensation was struck in the eye by an apple thrown by one fellow employee at another. Claimant took no part in the so-called horseplay, and had no knowledge of it until he was struck by the apple. An award was sustained on the theory that the injury arose because of (p 472) "associations and conditions inseparable from factory life." It is significant to note that the court differentiated the case from prior decisions in which the claimants who had joined in the horseplay were considered to have departed from their employment. For obvious reasons the New York holding may not be regarded as authority for a reversal of the decision of the appeal board in the present proceeding.

Plaintiff here was a participant in the conduct that led to his injury. While so engaged he was not in the course of his employment nor did his injury re-

sult therefrom. He and his companion were not working under conditions that may perhaps obtain in some factories where large numbers of men and boys are employed. Neither are we concerned here with a single sportive act indulged in on the spur of the moment by a careless employee. Rather, we have a series of acts extending over an appreciable interval with no one taking part therein except the plaintiff and his fellow workman.

Notwithstanding the general humanitarian purposes of the workmen's compensation act of this State, the legislature has not thereby authorized the payment of compensation for an injury sustained under the circumstances found by the appeal board. Under the facts the order entered by said board was correct and should be affirmed, with costs to defendants.

Dethmers, C. J., and Kelly, J., concurred with Carr, J.

Edwards, J. (*concurring*). Douglas Crilly was at the time of this accident a minor 16 years of age. He had been employed by one Clarence Ballou who, according to the record, was subcontractor of defendant Sam B. Wisdom, doing business as Wisdom Roofing & Siding, and insured by defendant Travelers Insurance Company.

Ballou apparently employed several boys, including plaintiff and his own stepson Arthur Wozniak, aged about 16, to assist him in the application of siding on new house construction. Douglas Crilly worked in this relationship only 3 full days, on the last of which he received an injury to his right eye which subsequently occasioned the loss of industrial vision therein.

Both Arthur Wozniak and Douglas Crilly were at the time of the injury illegally employed by defend-

ant Ballou in that they were below 18 years of age, and that no work permit for either had been secured as required by PA 1947, No 157 (CL 1948, § 409.1 *et seq.* [Stat Ann 1950 Rev § 17.701 *et seq.*]), commonly called the "Hittle act."

After reviewing various conflicts in testimony as to how this injury occurred (it appearing that both boys originally undertook to deny the horseplay which occasioned same), the majority of the appeal board entered the following finding:

"We find as follows: Douglas Crilly and Arthur Wozniak were engaged in playfully throwing objects at each other immediately preceding the injury of Douglas on July 9, 1953. During the course of such conduct a piece of shingle struck Douglas in the right eye inflicting serious injury and causing the loss of industrial vision in such eye. Douglas and Wozniak were engaged in horseplay which resulted in the injury. Ballou, their employer, had not condoned the horseplay. He had warned and instructed them against it. At the time the accidental injury occurred Ballou was outside the house and did not observe the particular incident. Douglas Crilly did not receive a personal injury arising out of and in the course of his employment."

This finding paralleled the finding of the referee.

Delbert Storie, member of the workmen's compensation appeal board, filed a dissenting opinion, the essence of which may be summarized as follows:

"Employers who choose to reap the labors of these immature children and bring them together must accept as a responsibility such antics of immaturity. It is not enough for them to say they did not condone the acts. Employers who reap the bounties of our minor children's labors must not be permitted to escape the responsibilities of injuries occurring because of the immature judgment of those they choose to employ. It is proper to assess the cost of such

injuries to the products created by these minors' labors."

We are, of course, required to accept the findings of fact of the appeal board where there is evidence to sustain the same. CL 1948, § 413.12 (Stat Ann 1950 Rev § 17.186). It is, however, obvious that the majority of the appeal board felt constrained to enter their last finding, namely, that "Douglas Crilly did not receive a personal injury arising out of and in the course of his employment," because of their preceding finding of fact that "Douglas and Wozniak were engaged in horseplay which resulted in the injury," and the application thereto of previous decisions of this Court dealing with horseplay: *Tarpper* v. *Weston-Mott Co.*, 200 Mich 275 (LRA 1918E, 507); *Jones* v. *Campbell, Wyant & Cannon Foundry Co.*, 284 Mich 358; *Derhammer* v. *Detroit News*, 229 Mich 658; *Steffes* v. *Ford Motor Co.*, 239 Mich 501.

These cases stand for a judicial restriction upon the effect of the workmen's compensation statute generally, to the effect that injuries resulting from horseplay in the course of employment cannot be regarded as compensable. We do not find any such limitation in the statute itself.

As to our current fact situation, there are 2 applicable statutory provisions: First, that of part 2, § 1:

"An employee who receives a personal injury arising out of and in the course of his employment * * * shall be paid compensation." CL 1948, § 412.1 (Stat Ann 1950 Rev § 17.151).

The second provision is part 2, § 2:

"If the employee is injured by reason of his intentional and wilful misconduct, he shall not receive compensation under the provisions of this act." CL 1948, § 412.2 (Stat Ann 1950 Rev § 17.152).

These 2 statutory tests are the controlling factors in this case. I concur with Mr. Justice SMITH's excellent discussion of the common-law doctrines of "liability based on fault" and "scope of employment" and his holding that they are entirely irrelevant in a workmen's compensation proceeding, there being no such restrictions in the statute.

Our 2 questions in this case are, therefore, (1) Did the accident arise out of and in the course of employment; and (2) Was it due to wilful misconduct on the part of the claimant.

As to the first of these, it is conceded by all that this accident arose in the course of employment. Douglas Crilly testified that at the time of the accident he was carrying shingles up the stairs to the second floor of a house under construction. Arthur Wozniak testified that he was cleaning up around the cutter and in that process threw the piece of shingle which struck Douglas.

Our real question is, Did the accident arise out of the employment?

The appeal board indicated disbelief of Douglas' testimony to the extent that it denied horseplay, and this conclusion, on this record, is certainly within their statutory discretion. CL 1948, § 413.12 (Stat Ann 1950 Rev § 17.186).

It does appear, however, that both boys were on the job at the time, and there is no evidence which disputes their testimony that they were actually engaged in the work. The object which occasioned the injury was a scrap of shingle which Arthur had cut and which he playfully threw at Douglas.

If it be argued that the casting of the shingle was caused by a boy's animal spirits rather than by his employment, the answer, in part, is certainly that this employer, in violation of State policy and law, saw fit to hire the animal spirits with the boy. In the writer's view, it would take an unjustifiably nar-

row construction of the words "out of" and "in the course of" the employment to hold that this injury did not thus arise.

The appeal board entered no finding on the second possible ground of statutory disqualification, "wilful misconduct." We do not feel, however, that the record before us would sustain disqualification on this ground. Wilful misconduct implies something more than negligence, and more than a violation of rules or instructions. *Gignac* v. *Studebaker Corporation,* 186 Mich 574; *Beaudry* v. *Watkins,* 191 Mich 445 (LRA1916F, 576); *Day* v. *Gold Star Dairy,* 307 Mich 383.

See, also, *Boynton Cab Co.* v. *Neubeck,* 237 Wis 249 (296 NW 636); *Boynton Cab Co.* v. *Schroeder,* 237 Wis 264 (296 NW 642); *M. F. A. Milling Co.* v. *Unemployment Compensation Commission,* 350 Mo 1102 (169 SW2d 929, 146 ALR 239).

For the reasons cited, we feel that to the extent that the *Tarpper, Jones, Derhammer,* and *Steffes Cases, supra,* represent a holding by this Court that where horseplay occasions a personal injury, that fact of and by itself bars recovery in a workmen's compensation proceeding, they are overruled.

With them, the last sentence of the findings of the appeal board likewise falls, it having been based, in our view, on the case law now overruled.

More need not be said in this matter in view of Justice SMITH's comprehensive opinion, with which the writer at this point concurs except for the general discussion and holding pertaining to malicious aggressor cases contained therein. The instant case, in my view, does not require decision on this line of cases.

For the reasons indicated and with the exception noted, I concur in the opinion and in the result of Mr. Justice SMITH.