PETRIE v GENERAL MOTORS CORPORATION

Docket No. 124945. Submitted November 14, 1990, at Detroit. Decided January 22, 1991, at 10:15 A.M. Leave to appeal sought.

Morton L. Petrie, a General Motors Corporation employee, was electrocuted at his workplace when he made contact with an electrified rail while engaged in horseplay. Judi Petrie, the decedent's widow, was awarded workers' compensation by a hearing referee on the ground that the decedent's death arose in the course of employment. The Workers' Compensation Appeal Board affirmed. The Court of Appeals denied the defendant leave to appeal. The Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for consideration as on leave granted. 434 Mich 852 (1990).

The Court of Appeals *held:*

1. An injury sustained in the workplace by an employee as a result of horseplay instigated by the employee is not compensable under the workers' compensation act where the horseplay is a deviation from the course of employment. Whether the initiation of horseplay should be considered a deviation from a course of employment depends on the extent and seriousness of the deviation, the completeness of the deviation, the extent to which the practice of horseplay has become an accepted part of the employment, and the extent to which the nature of the employment may be expected to include such horseplay.

2. There is no basis for finding a compensable injury in this case. The decedent left his work area, engaged in conduct wholly unrelated to his employment, and was not engaged in any productive labor at the time of the accident. Nor had his actions become an accepted part of his employment.

Reversed.

*Feikens, Foster, Vander Male & DeNardis, P.C.* (by *Robert H. Feikens*), for the plaintiff.

*Swistak & Levine* (by *James Dunn*), for the defendant.

Before: GRIFFIN, P.J., and SAWYER and BRENNAN, JJ.

PER CURIAM. Defendant appeals from an order of the Workers' Compensation Appeal Board which affirmed a hearing referee's award of benefits. Defendant sought leave to appeal to this Court, which denied leave in an order dated April 17, 1989 (Docket No. 112727). Defendant then sought leave to appeal to the Supreme Court, which, in lieu of granting leave to appeal, remanded the matter to this Court for consideration as on leave granted. *Petrie v General Motors Corp,* 434 Mich 852 (1990). We reverse.

The matter was submitted to the hearing referee on the stipulated facts contained in the defendant's trial brief. The pertinent facts set forth in defendant's brief are as follows:

> Morton Petrie, hereinafter referred to as "Plaintiff," commenced his employment with the General Motors Corporation, hereinafter referred to as "Defendant," on October 31, 1977. He was employed on the afternoon shift in the drill and tap department in an unskilled capacity. Plaintiff was assigned to the machine-head cylinder assembly line in Department 525. Plaintiff's last day of employment was January 14, 1981. Plaintiff's average weekly wage on his last date of employment was $474.94, exclusive of fringe benefits.
>
> On January 14, 1981, at approximately 11:00 P.M., Plaintiff and his co-employee John Walters were discussing Plaintiff's age and the fact that his physical appearance was that of a much younger man. At the conclusion of this conversation Plaintiff picked up a wooden stick, walked several feet and struck the side of an inspection crib in his department and looked inside. Plaintiff then dropped the stick, left Department 525 and walked east approximately 50 feet to Department 503 and entered the supervisor's cubicle. Plaintiff climbed onto the top of the supervisor's desk and from there to the top of a four-drawar [sic] metal file cabinet located at the side of the desk. From the

file cabinet, Plaintiff climbed on top of an inspection crib (not the same inspection crib which he had earlier hit with the stick) which was adjacent to the supervisor's cubicle.

Once on top of the inspection crib, Plaintiff squatted beneath a hoist rail and positioned himself midway along the east edge of the roof. Plaintiff then raised himself from a squat to a stooped position and peered through the fencing into the crib. Plaintiff stood up and turned to face north. John Walters, who had remained at his work station, yelled for Plaintiff to get down, stating further, "You might get into trouble." Three other co-employees, Joe C. Thomas, Raymond McKenzie and Carl Komradt, also cautioned Plaintiff to climb down: Carl Komradt and Raymond McKenzie further warned Plaintiff that he could get electrocuted from the electric hoist rail suspended above the crib ceiling.

Despite the numerous warnings, Plaintiff did not descend from the top of the inspection crib. Instead, Plaintiff grabbed the electrical hoist power rail with his left hand, reached under and around the rail with his right hand and inserted his fingers into the triangular-shaped opening in the rail. Completion of an electrical circuit was achieved. Plaintiff then fell from the top of the inspection crib into the adjacent supervisor's cubicle, striking his head on the edge of the file cabinet and landing on the supervisor's desk.

An ambulance was summoned and Plaintiff was provided oxygen and conveyed to the plant medical facility where cardiopulmonary resuscitation was administered. An EMS vehicle arrived and conveyed Plaintiff to Redford Receiving Hospital. Plaintiff arrived at the hospital at 11:55 P.M. and was pronounced dead at 12:07 A.M. on January 15, 1981.

An autopsy was performed at the Wayne County Medical Examiner's office on January 15, 1981. The toxicology report indicated that the alcohol level was .07% in Plaintiff's blood and .11% in his urine. Cause of death was determined to be electrocution.

In addition to agreeing on the facts, the parties also agree that we should turn our attention to the case of *Crilly v Ballou,* 353 Mich 303; 91 NW2d 493 (1958). In *Crilly,* two young workers were employed by a contractor for roofing and siding work. From time to time, the two workers would throw shingles and nails back and forth at each other. This conduct did not arise from vindictiveness or animosity, but constituted what generally has been referred to in these cases as "horseplay." During one such incident, one of the workers was injured when one of the thrown shingles struck him in the eye.

The *Crilly* Court found the injury compensable, even though the workers were not employed to throw shingles at each other. Rather, the Court reasoned that the injury was compensable because it arose in the course of employment, with that concept including the acceptance of those activities by an employee which have a causal connection with the employment, even though the specific action which resulted in the injury was not, strictly speaking, the conduct the employee was employed to engage in. *Crilly, supra* at 326-327. The *Crilly* Court, however, did not define the limit at which horseplay ceases to be within the course of employment, and therefore compensable, and exceeds the course of employment and is no longer compensable. *Id.* Rather, the Court merely concluded that the injuries in that case were within the course of employment. Beyond the fact that *Crilly* stands for the proposition that some, though not all, injuries resulting from horseplay are compensable under the workers' compensation act, the *Crilly* decision does not clearly determine how the case at bar should be decided.

We do, however, find guidance in Professor Larson's discussion of this issue:

Injury to a non-participating victim of horseplay is compensable. As to instigators or participants, some states permit recovery if such activity has become customary.

The current tendency is to treat the question, when an instigator is involved, as a primarily [sic] course of employment rather than "arising-out-of-employment" problem; thus, minor acts of horseplay do not automatically constitute departures from employment but may here, as in other fields, be found insubstantial. So, whether initiation of horseplay is a deviation from course of employment depends on: (1) the extent and seriousness of the deviaton [sic], (2) the completeness of the deviation (i.e., whether it was commingled with the performance of duty or involved an abandonment of duty), (3) the extent to which the practice of horseplay had become an accepted part of the , employment, and (4) the extent to which the nature of the employment may be expected to include some such horseplay. [1A Larson, Workmen's Compensation Law, § 23.00, p 5-178.]

Applying the four criteria stated by Larson, there is no basis for finding a compensable injury in the case at bar. First, concerning the extent and seriousness of the deviation from the course of employment, the deviation in the case at bar was significant, though certainly not complete. Specifically, the decedent left his work area and engaged in conduct wholly unrelated to his employment. This is in contrast to *Crilly, supra,* where the horseplay occurred while the workers were engaged in their assigned work. While it is true that the decedent in the case at bar did not abandon or deviate from his work to the extent of leaving the workplace, it is also true that he was not engaged in any productive labor at the time of the accident.

Second, Professor Larson directs our attention to the completeness of the deviation, that is, whether

it was commingled with the performance of the employee's duties or involved an abandonment of those duties. Again, as discussed above, the decedent's activities at the time of his death were wholly unrelated to the performance of his job. He had ceased performing his job in order to engage in the conduct which led to his death.

The third factor is the extent to which the practice of horseplay had become an accepted part of the employment. This factor, as well as the fourth factor, the extent to which the nature of the employment may be expected to include some horseplay, are difficult to evaluate from the record before us. However, there is nothing in the stipulated facts to suggest that the horseplay had become an accepted part of the employment or was to be expected from the employment. Accordingly, we must weigh these factors against the awarding of benefits as well.

In answering the question whether the decedent's injuries can be said to have arisen in the course of employment, we must answer that question in the negative and conclude that the WCAB's determination to the contrary constitutes an error of law. Simply put, the WCAB erroneously reasoned that the decedent's death arose in the course of employment. See *Juniac v ITT Hancock Industries,* 181 Mich App 636, 639; 450 NW2d 22 (1989).

Reversed. Defendant may tax costs.