24 N.J. Super. 492 (1953)
94 A.2d 873
AGNES SCHULTZ, PETITIONER-APPELLEE,
v.
HENRY V. VAUGHANS SONS & CO., INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Camden County Court Law Division.
Decided January 30, 1953.
*494 Mr. Edwin Segal, attorney for the petitioner-appellee.
Mr. H. Hurlburt Tomlin, attorney for the respondent-appellant (Messrs. Orlando, Devine and Tomlin, attorneys).
SHEEHAN, J.C.C.
This matter is before the court on appeal from a determination of facts and rule for judgment of the Workmen's Compensation Division in the Department of Labor and Industry by which an award was made in favor of the petitioner.
The respondent urged as grounds for the appeal that the deputy commissioner below erred in finding that the injury which admittedly caused the death of the petitioner's decedent, was sustained in an accident arising out of and in the course of the latter's employment and erred further in his rejection of the statutory defense of intoxication.
The testimony discloses that William J. Schultz was employed by the Henry V. Vaughans Sons & Co., Inc. on December 6, 1950 as a fireman on a water-borne pile driver which was moored alongside a sunken barge in the Delaware River shore line, within the yard of the RTC Shipbuilding Company. It may be gathered from the record that the shipbuilding company made improvised use of the barge as a pier and that the respondent had been engaged to drive piling into the river bed and around the perimeter of the barge, leaving a clearance of 18 to 24 inches between the side of the barge and the line of piling. The object to be served was to arrest the movement of the barge toward the adjoining railway dock. The shipyard property sets in a basin of obviously natural contour several hundred yards in depth and tapering in width from mouth to shore from about 100 yards to 50 yards. The barge lay midway of the basin's mouth with its stern just barely into the river stream and its bow pointing perpendicularly to the shore. A pier about *495 12 feet wide extending in a direct line from the shore and built right into the bow of the barge a distance of about two-thirds of the total basin completes the perpendicular and provides the link between the barge and the land.
While it is not entirely clear from the record it would appear that the pile driver on which the decedent was employed came into the basin opening and pulled to alongside the barge in a position convenient to drive the pilings around it. It may also be inferred that as the progress of the work required, the pile driving equipment was moved along the side of the barge. In the actual driving of the pile it was necessary for some of the workmen to take positions between the barge and the pile driver, and in order that they might do so a floating stage about five feet wide was put overboard between the barge and the pile driver and they worked from it. Thus passage between them could only be made across a 16-foot length of plank which was placed one end on the deck of the barge and the other on the deck of the pile driver. The boiler which the decedent fired to provide the power was located on the stern of the pile driver. Hence, in order to reach the pile driver from the shore side it was necessary that he enter the grounds of the shipyard, walk to the water's edge at the beginning of the pier, out the whole length of the pier onto the bow of the barge, over the barge to the plank bridging the gap between the barge and the pile driver and thus to his work place.
On December 13 the petitioner's decedent, having been paid, went ashore in the late afternoon and, so far as the testimony reveals, was next seen in a tavern located across the street from where he was living in the city of Gloucester. This was at about 11:30 P.M. The owner of the taproom who had known him since he first came to Gloucester, a period of about two and a half years, testified that he drank not over a half dozen glasses of beer, had one drink of whiskey and ate a sandwich and a bowl of soup. At about five minutes after one in the morning of the 14th the taproom proprietor called a cab for the decedent and heard the latter tell the *496 cab driver that he was going to North Camden to work, and testified further that when he himself asked why it was that Schultz wanted to leave so early, he was told by the decedent that the latter could go up there and sleep on the job.
Evidence was also adduced through the cab company dispatcher and a driver who took a call in the early morning hours of December 14 directing him to the taproom in question, from which it may reasonably be inferred that the decedent was discharged from the cab in front of the RTC Shipyard at about 1:45 A.M., and while the cab driver testified that his fare staggered off in the opposite direction from the shipyard, the watchman on duty at the place testified that he admitted a man at about 2 o'clock who said he was working on the tugboat alongside the dry dock, and while no positive identification was made, the meshing of all the circumstances of time, place and description is such that a contrary finding is virtually prohibited. It is therefore held as a matter of fact that the petitioner's decedent was the man who entered the shipyard property at that time.
The thread of the direct evidence is broken from that point and is resumed with the testimony of Walter Wilson, the foreman in charge of the job, who said that he came aboard about 7:20 to discover that there was no fire in the boiler. The duty of starting the fire was the decedent's who was expected to be on the job in advance of the full gang and have the steam up in order that they could start driving at 8 o'clock. The foreman having done this job, sat and talked awhile with the engineer and the rest of the men, then went out to look over the work. As he did he looked at the floating stage, under the gangplank and saw a hat which he recognized as belonging to the missing fireman. After talking further with the men he looked down between the barge and the sheathing and saw the decedent in an upright position "standing" in water up to his shoulders with his head bent over and hanging into the water. As one witness put it, he was "boxed in." According to the foreman, the point at which he observed the body was about five feet *497 from the gangplank between the barge and the pile driver on the shore side. A call was then made to the police and the men went about the task of raising the decedent. This was done by catching his coat with a boathook and putting him up out of the water and on to the barge. The coat was described as being a mixed grey light overcoat underneath which he had on his working clothes. The decedent was placed upon a hand-car and a fire rescue squad started to give artificial respiration which was continued until they were ordered by an interne summoned to the scene to cease. Upon examination the doctor could detect no heart beat but thought that he felt a definite but rather feeble pulse. With this the doctor ordered resumption of the artificial respiration, the removal of the decedent to the hospital and his being placed in an iron lung. About an hour later and while the decedent was still in the iron lung, a surgical resident pronounced him dead. The county physician was then summoned and at about 10 A.M. performed a postmortem on the body, as a result of which it was determined that death resulted from a contusion of the pons, a portion of the base of the brain directly in front of the cerebellum, providing the passageway for the nerves entering the spinal column. It was the doctor's opinion that the decedent was struck on the top of the head with such force as to propel the brain into violent contact with the floor of the cranial vault. This was the only evidence of pathology observed in any of the organs examined and was assigned by him as the sole producing cause of the death. The certainty with which the medical expert advanced this opinion was in great measure influenced by the fact that there was not the slightest evidence or mark of external violence anywhere on the body. This presents perhaps the only element of substantial fact disputed by the witnesses, and that dispute is resolved by the acceptance of the doctor's testimony, it being inconceivable that in the performance of an autopsy such a trained observer would have missed a wound so gross as that described by the petitioner's witness.
*498 Laboratory examination of the brain revealed an alcoholic content by weight of 0.1358 per cent, a quantity within the 2-plus range of intoxication significant of the slowing of the reflexes, beginning loss of coordination and unsteadiness of gait. With respect to the precise time of death the county physician said that when he saw the body it was by appearance such as to seem "as though he had just died." This was in explanation of the doctor's immediately prior statement that he had not been dead too long.
Except as noted the facts established by this record are not controverted in the ordinary sense that immediately and mutally exclusive factual situations are contended for by the parties. Rather might it be said that relying upon a foundation of fact substantially similar to that narrated, the petitioner argues the inference more reasonably to be drawn is that the petitioner's decedent was injured by accident arising out of and in the course of his employment, and the respondent argues that the inference cannot reasonably be drawn that the accident arose out of and in the course of employment, or in the alternative that the respondent has established the fact of the decedent's intoxication as the proximate cause of the injury causing death.
The test applied to determine the effect to be accorded the statutory phrase "out of and in the course of the employment" was first laid down by an appellate court within two years after the adoption of the Compensation Act. It appears in Bryant v. Fissell, 84 N.J.L. 72, 86 A. 458 (Sup. Ct. 1913), where it was held that:
"an accident arises `in the course of the employment' if it occurs while the employe is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time * * * and * * * an accident arises `out of' the employment when it is something the risk of which might have been contemplated by a reasonable person, when entering the employment, as incidental to it."
The intervening years have taken nothing from the definition thus fashioned, as may be gathered from its citation and re-affirmation as recently as the case of Miller v. Bill Miller's *499 Riviera, 21 N.J. Super. 112 (App. Div. 1952). As with so many principles which are models of clarity and simplicity in their expression, this landmark in the workmen's compensation law admits of no facile application to the factual situations that come to court in potentially infinite variations. Were it not for the assuring presence of an accompanying principle just as solidly fixed and even more immediately established upon the enactment of the statute, the problem of applying the facts to the law would be even more vexing than it is. This, of course, is the salutary declaration that the act is to be given a liberal construction to effectuate the avowedly social purpose for which it was framed. So intimately is this principle ingrained within, rather than engrafted upon, the act that in not one of the many later cases in our appellate courts has the opinion writer deemed it necessary to support it by citation, and in only one was it referred to at all. It is mentioned here to put down the possible misapprehension that it is presently of any less importance than it was when first pronounced, and to suggest that the observed disposition to leave it unmentioned manifests an automatic and universal acceptance which infuses it with a vigor making constant repetition needless.
With this primary perspective established the analogous cases may be more helpfully considered, though as pointed out in both Marston v. Curtiss Wright Corporation, 1 N.J. Super. 107 (App. Div. 1948) and Jochim v. Montrose Chemical Co., 4 N.J. Super. 157 (App. Div. 1949), the facts presented in a particular case are the prime matter in the decision of it, and further that:
"[We] recognize the presence of shifting emphasis resulting in differing conclusions resting on slight factual distinctions of doubtful significance."
For the respondent the most cogent are three English cases in each of which a seaman was returning to his ship after having gone ashore. It may be fairly said that if these decisions were of controlling force that they would give strong support to the respondent's contention, but an examination *500 of the recent New Jersey cases in which the matter of the means of ingress and egress to and from the place of employment was under scrutiny, reveals a clearly discernible tendency to extend the "place where (worker) may reasonably be" to include any route to a location which exposes the worker to a travel risk peculiar to it and not conventionally encountered, as in Rubeo v. McMullen Co., 117 N.J.L. 574 (E. & A. 1937) where the court reversed a Supreme Court holding that an injury sustained while the claimant was traveling from work in a truck supplied by the employer for its workmen was not compensable; and McCrae v. Eastern Aircraft, 137 N.J.L. 244 (Sup. Ct. 1948), where the claimant was knocked to the ground by a fellow worker running along the highway to a parking lot opposite the employer's plant. The movement of vehicular traffic along the highway and the passage of the workmen on foot across this road was directed by a traffic officer provided by the employer. The Court of Errors and Appeals, in the Rubeo case, cited a number of United States Supreme Court cases interpreting various federal compensation acts and one reviewing on constitutional grounds a decision in a State Compensation Act which, reported as Cudahy Co. v. Parramore, 263 U.S. 418, 44 S.Ct. 153, 154, 68 L.Ed. 366 (1923), contains the following language:
"But the contention here, shortly stated, is that the accident was one which occurred off the premises of the employer on a public road, outside the hours of employment and while the employee was not engaged in any business of the employer; that it was not the result of any industrial risk but arose from a common peril to which the public generally was exposed; and that consequently liability is imposed arbitrarily and capriciously."
After thus stating the employer's contention the court sustained the award under the Utah state act where it had been shown that the employe was killed when the automobile in which he was riding to work was struck while crossing a railroad track lying immediately adjacent to the plant some few minutes before the employe's work as a stationary engineer was to begin. The court held that:
*501 "Whether a given accident is so related or incident to the business must depend upon its own particular circumstances. No exact formula can be laid down which will automatically solve every case. The fact that the accident happens upon a public road or at a railroad crossing and that the danger is one to which the general public is likewise exposed is not conclusive against the existence of such causal relationship, if the danger be one to which the employee, by reason of and in connection with his employment, is subjected peculiarly or to an abnormal degree. * * * Here the location of the plant was at a place so situated as to make the customary and only practicable way of immedate ingress and egress one of hazard."
This sharp divergence between the application of the English Courts (there are English cases involving workers other than seamen to opposite effect) and the New Jersey courts to cases such as the one here under review requires the rejection of the former as precedents of any authority. Impelled by these considerations, a determination is made herewith that the decedent sustained an accident at a place where the nature of his employment and the means by which he was able to reach it might reasonably require him to be.
This leaves still for decision the other necessary element within the definition set out in Bryant v. Fissell, supra, respecting the time when the accident happened. The respondent suggests that the inference to be drawn from the testimony is that Schultz, on entering the yard, continued immediately out across the pier on to the barge and at that time his drunken condition caused him to be caught in the position in which he was seen at 8 o'clock. The inference that the petitioner suggests is that the decedent found a place to sleep on the property and upon waking went out to begin his work on the pile driver and sustained his fall at that time. The evidential rule here to be invoked has been frequently repeated in compensation cases, most recently in Jochim v. Montrose Chemical Co., 3 N.J. 5 (1949), when it declares:
"In civil cases it is sufficient if the circumstantial evidence be such as to afford a fair and reasonable presumption of the facts inferred. Circumstantial or presumptive evidence, as the basis for deductive reasoning in the determination of civil causes, is a mere preponderance of probabilities. The only requirement is that the claimed conclusion *502 from the offered fact must be a probable or more probable hypothesis, with reference to the possibility of other hypotheses. This is merely a rational inference, i.e., based upon the common experience of mankind. In the final analysis `probability, and not the ultimate degree of certainty is the test.' Seiken v. Todd Dry Dock, Inc., 2 N.J. 469, 475 (1949); Hercules Powder Co. v. Nieratko, 113 N.J.L. 195, 203 (Sup. Ct. 1934), affirmed 114 N.J.L. 254 (E. & A. 1934); Manziano v. Public Service Gas Co., supra; Russo v. Wright Aeronautical Corp., 1 N.J. 417, 421 (1949)."
The inference that appears more probable in the circumstances is that the decedent cast about for the most likely place to get a few hours rest, and of all places the one least likely to appeal to him would be the pile driver out in the river and the place more likely would be somewhere in the shelter of, if not within the several structures on, the shipyard property. The established fact that the decedent had been drinking prior to his arrival militates more in favor of this inference than against it, and as important as any single factor is the testimony that the decedent was either still alive when his body was examined by the physician on the scene or, in the testimony of the county physician, that at 10 o'clock it seemed as though he had just died. No pretense is made that this approaches the ultimate in certainty, but if the common experience of mankind provides any basis for making and drawing an inference this would appear to be the more probable of the many which might be probable or merely possible. It would be idle to claim for this finding that it is the only one that can logically be made, but it may be ventured that the present state of our case-made compensation law establishes it as the only one that may be legally made.
It is therefore held that the decedent sustained the injury causing his death while making his way over the only route of ingress to his place of employment at a time when he would reasonably be going to work and as a result of a risk incidental to that employment.
The respondent's alternative contention that the decedent's intoxication caused the injury must be considered in *503 the light shed by the case of Bujalski v. Flockhart Foundry Company, 16 N.J. Super. 249 (App. Div. 1951) in which the Appellate Division affirmed on the opinion of Judge Francis, reported in Kulinska v. Flockhart Foundry Co., 9 N.J. Super. 495 (Cty. Ct. 1950), in which it was held that:
"The article `the' in this statutory context is a word of exclusion. It means that in order to defeat recovery the employer must show by the greater weight of the evidence that the employee's injury was producd solely by his intoxication. In other words, the employment must supply no more than the setting, the stage, the situation in which the fall occurred; it can be no more than an inactive condition as distinguished from a moving cause. If the hazards or risks which are incidental to the employment concur with the employee's insobriety in producing the fall or if the hazards or risks contribute efficiently to the production of the fall, compensation cannot be denied. If the Legislature intended intoxication as a concurrent or contributory cause of an injury to effect a deprivation of the benefits of the statute it would have been a simple matter to have said so."
In the instant case of the respondent's witnesses who testified on this point, one said unequivocally that the decedent was not drunk as late as 1:30 in the morning of the 14th and the other, the watchman, said that he would not have admitted him into the yard if he had been drunk. The most that can be found is that the decedent had drunk a glass of whiskey and five glasses of beer between 11:30 and 1:30 and it may be inferred from the alcoholic content of the brain that he had been drinking before that, but it appears as well that his systemic tolerance for alcohol was great because of his habitual imbibing. Under such proof the burden resting upon the respondent to prove that the decedent was intoxicated and that such intoxication was the sole and proximate cause of the accident has not been met.
For these reasons the injury causing the death of the respondent's decedent is found to have resulted from an accident arising out of and in the course of his employment, and it is further held that the intoxication of the decedent was not the natural and proximate cause of that accident.