55 N.J. Super. 336 (1959)
150 A.2d 781
CONCEPCION OLIVERA, PETITIONER-RESPONDENT,
v.
HATCO CHEMICAL COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 1959.
Decided May 4, 1959.
*339 Before Judges PRICE, GAULKIN and CONFORD.
Mr. Edward B. Meredith argued the cause for respondent-appellant.
Mr. Hyman Hoberman argued the cause for petitioner-respondent (Mr. Louis Hoberman, attorney; Mr. Arnold M. Stein on the brief).
The opinion of the court was delivered by PRICE, S.J.A.D.
This is a workmen's compensation case. By this appeal Hatco Chemical Company seeks to reverse a judgment of the County Court which affirmed a determination and judgment of the Department of Labor, Division of Workmen's Compensation, in favor of petitioner, Concepcion Olivera, widow of Israel Olivera, an employee of Hatco at its Fords plant. Appellant contends that petitioner failed to establish that the death of decedent on October 28, 1955 arose out of and in the course of his employment. Affirmatively, it asserts that his death "was circumstantially shown to have arisen as the natural and proximate result of intoxication."
Decedent was survived by a widow and four minor children. Appellant contends also that petitioner and her children were partial and not full dependents and that compensation *340 awards in their favor on the basis of a finding of full dependency constituted error. Appellant additionally urges that reversible error was committed by the Division in the exclusion of certain testimony to which reference is hereinafter made.
We analyze the evidence revealed by the record before us in order "to determine the facts and evaluate them," giving "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses." Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958); Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 448 (1958).
Decedent was employed by appellant as a centrifuge operator at the time of the accident in question. He had been employed by Hatco for 18 months next preceding the date of the accident, and for the last six months of that period was engaged mainly in operating a large centrifuge, powered by electricity and operated by push buttons. The machine was housed in a shed at the Hatco plant. The shed was of a size sufficient only to accommodate the machine and the operator, who when working would stand on a platform about two feet in width located between the machine and the outer shed wall. The shed was located at the edge of a declivity and was open on two sides.
The dimensions of the centrifuge and the method of its operation were described by a safety inspector of the New Jersey State Department of Labor and Industry as follows:
"The overall horizontal top cover of the Centrifuge was five foot, two inches long; and there is a circular four inch lip making the house diameter four feet, ten inches; the basket, inside diameter, is three foot, ten inches with a five foot circular well surrounding the basket; the basket opening at the top is thirty-two inches; the center, a Bird-type Centrifuge, 600 rpm's; and it is powered with a fifteen horsepower class one, group D motor.
The motor is mounted in the vertical plane with a four inch shaft that drives the basket.
This particular Centrifuge is used to remove esters from a slurry cake made up of carbon. It is actually sludge coming from a filter-press * * *."
*341 The shift foreman in charge of operations in the ester plant testified that the "centrifuge is used to extract the clay from Stoddard Solvent * * * which is used to extract the ester from the clays." He further testified that a "digger" operates on a crank to scrape "the clay out of the centrifuge"; that to operate it "you're supposed to shut the machine down so that it's revolving very slowly and gradually adjust your digging blade so it will cut the clay away from the sides of the centrifuge * * * it's raised and lowered by a wheel and you have to * * * adjust the blade outside the centrifuge itself."
At about 9:45 P.M. on October 26, 1955 one Martinez, a co-employee, found decedent lying unconscious on the platform in the shed alongside of the machine, which was then running. A broken piece of lumber was stuck in the slurry inside the centrifuge. Another piece of lumber was found on the ground at a distance variously estimated at 6 to 12 feet from the shed. The pieces, when matched, formed a two-by-eight plank approximately six feet in length. The inference was that the piece outside of the building had been flung there by the force of the operating machine. Other lumber of the type and kind formed by the matching pieces above described was located about 1,000 feet from the shed at the opposite side of appellant's plant where some concrete forms had been laid. There was no evidence as to how the piece of lumber had become lodged in the interior of the machine, nor as to how, when or under what circumstances it had been removed from the distant point aforesaid, assuming that it had been located there originally.
Olivera was pronounced dead on his arrival at the hospital at about 10:40 P.M. Autopsy performed by Dr. William Wilentz, the county physician, revealed that decedent had suffered a complete transverse fracture of the sternum at the level of the fifth rib, vascular engorgement, extensive brush abrasions over the entire sternum and extending to the mid-neck and under the chin area. Death was caused by hemorrhage, traumatic hemopericardium resulting from *342 a ruptured heart, associated with the fractured sternum. A blood examination revealed that there was a concentration of 0.1634 per cent by weight of alcohol in decedent's blood; or phrased differently "1.634 milligrams of alcohol per gram" of blood; and further described as "2-plus alcohol," which defines the range from 0.15 to 0.25 per cent.
Testimony describing the activities of decedent on the day of the accident revealed that at about 9 A.M. decedent accompanied Martinez from Perth Amboy to Newark on a personal errand of Martinez. They had lunch at the home of a cousin of Martinez on their return to Perth Amboy at about 1 P.M., rested for awhile, and then went to the Hatco plant where Olivera and Martinez were employed on the 3:30 P.M. to 12 midnight shift. Until about 7:30 P.M. or 8:00 P.M. the two worked changing kettles, cleaning presses and cleaning the floor. They ate together commencing about 7:30 P.M. or 8:00 P.M. When finished, they separated for their respective tasks. Decedent's assigned work was the operation of the centrifuge. Martinez testified that during the day when he was in the company of Olivera he did not see him consume any alcoholic beverages; that up to the time they separated at about 8 P.M. he noticed nothing unusual about him and saw no sign of intoxication. Martinez did not thereafter see Olivera until he discovered him dying at about 9:45 P.M. on the shed platform as aforesaid. Martinez testified that he had gone to the clay shed at that hour as he had a "break" in his own work and walked to the clay shed to see Olivera as "he was the only Spanish fellows [sic] that was working there then."
Decedent was seen by one Grover, a shift foreman employed at Hatco, at about 9 P.M. Olivera, in working clothes, came to the place in the plant where Grover was working, about 800 or 900 feet from the shed, and asked the latter for a cigarette which Grover gave him. He was in Grover's company for "a minute or two." They conversed briefly in a lighted area although handicapped by decedent's limited knowledge of the English language. Grover saw nothing *343 irregular about decedent's gait or his manner. Later that night Grover saw Martinez in front of the "clay shed" gesticulating wildly. He went to the shed and saw decedent lying on the floor of the shed facing the machine. He was then still breathing.
The centrifuge had worked properly when in charge of a Hatco employee who had operated it until 3 P.M. or 3:30 P.M. on the day of the accident, and, when tested the morning after the accident, was found to be operating satisfactorily.
Appellant, in seeking to establish its contention that decedent's death resulted from intoxication, contended that the proofs showed that in the operation of the machine there was no normal use to which a piece of lumber of the type in question could be reasonably devoted. Its theory was that the timber, inserted into the moving machine by decedent, was thereby broken and a piece of it struck decedent's chest; that decedent was intoxicated when he performed the reckless act.
Appellant produced Dr. John P. Brady, a chemist and toxicologist who had analyzed decedent's blood following the autopsy. He testified that a "person under the effect of .16 alcohol would not react to stimuli in the way that a person who had not ingested alcohol to that percentage would react. His sense of balance would be changed; his sense of responsibility would be changed; his reactions against the normal procedure would be radically different * * * and his functioning would not be one of a normal person."
Dr. Wilentz, on behalf of respondent, testified in response to a hypothetical question which included the known facts surrounding the accident, the results of the autopsy and blood analysis. He was asked "whether or not the intoxication of the decedent was in this particular case the sole proximate cause of the injury resulting in his death." He answered that decedent "had a 2-plus alcohol * * * that a 2-plus alcohol produces certain behavior; certain physiological *344 behaviors. They are, muscular incoordination, emotion and mental instability. * * *" He expressed the belief "that there was a causal relationship probable in this case in view of the alcohol that was found in this man's blood and the fatal termination in the case." Noting that a traumatic death was involved he testified: "I can't speak with definite certainty that it [alcohol] was the sole cause." In response to a question as to whether or not "the alcohol content as shown in the blood could reasonably be the competent producing cause of the accident and the resulting injury," he replied: "The probabilities are there."
On cross-examination he stated that the "2-plus Classification" covered the range hereinabove indicated; that the content on analysis was "just above the 1-plus classification." He acknowledged that the various degrees of behavior could depend "upon how much alcohol is found in the blood."
Dr. Asher Yaguda, responding to a hypothetical question which involved the assumption of the same facts which had been incorporated in the question presented to Dr. Wilentz, testified that: "In view of the hypothetical question, the absence of any other cause, it is my opinion that the alcoholic content in this man's blood was sufficient to produce intoxication; and that this intoxication was the proximate cause of the injuries which resulted in this man's death."
On cross-examination he was asked whether in his opinion decedent "was mildly intoxicated, moderately, or markedly" and he answered: "I would say that he was intoxicated; and that he was moderately intoxicated because of the contents of alcohol." He further testified that he recognized that decedent's death was caused by a "ruptured heart" and believed that "alcoholic intoxication, that is the alcohol itself" was not the cause of his death but that "alcohol was the only cause ascertainable of the injury which produced his death." He added: "In other words, I don't believe this was acute alcoholism in any way. * * * The intoxication produced the accident which caused the death." He then testified as follows:
*345 "Q. There could have been a number of other reasons for the accident, couldn't there, Doctor? A. It is the only one which is ascertainable from the hypothetical question.
Q. You are assuming that this man took this piece of lumber, and stuck in [it] into the machine? A. That is my assumption."
Dr. Saul Lieb, testifying on behalf of petitioner, in response to a similar hypothetical question, expressed the opinion that "the blood level of alcohol in this case combined with the facts in the hypothetical question does not show that there was any causative relation between this blood level that was found and his death." In amplification he emphasized that decedent's death resulted from the rupture of his heart caused by "a piece of timber which struck him in the chest. * * * There is nothing that I have here that shows that this blood level of alcohol had anything to do with his death." He further testified that there was no evidence that the alcoholic content "would interfere substantially" with decedent's operation of the centrifuge. He added: "I wouldn't make a diagnosis of acute alcoholism as such just because this blood level, which is slightly above the upper limit of so-called social, normal, I would want, in order to make a diagnosis of acute alcoholism, a clinical picture that goes along with the diagnosis," such as "incoordination, musculature incoordination. * * *" He emphasized the absence of any such elements and added:
"Knowing the capacity of individuals for tolerance to alcohol varies, I would be guided in this type of case in which there is only a small degree of alcoholic content over the accepted upper limit of normal, I would have to be guided by the clinical appearance and actions to come to the conclusion that this blood alcohol level had any effect on him in his work."
In passing, we deem it essential to note that the opinions of certain of the medical experts in this case were sought and expressed to an extent which encroached on the function of the Deputy Director, who had to make the ultimate decision of causal relationship. They were asked to express their respective views as to the varied effects of *346 alcohol dependent on the extent of its use; the tolerance to alcohol exhibited by different individuals; the behavior patterns which follow its use, such as muscular incoordination, emotional and mental instability, behavioral and psychic changes; and the significance of the result of the blood analysis which showed an alcoholic concentration of 0.1634%; all of which subjects were within their expert knowledge and with reference to which they might properly express and did express their opinions. The experts were asked to go beyond these areas. Their opinions were sought and given with reference to the traumatic death involved and the factual cause thereof and specifically with reference to the probability that alcohol caused it. One of the doctors was asked specifically whether or not the alcohol in his opinion was "the cause of the injury noted" and again whether or not "the alcohol content as shown in the blood could reasonably be the competent producing cause of the accident and the resulting injury." Another of petitioner's doctors, responding to interrogation, expressed the view that the alcohol "produced the accident which caused his [decedent's] death." One of petitioner's medical experts (who also was familiar with the operation of a centrifuge) was in fact asked by the Deputy Director whether or not in his opinion "the accident would have happened were it not for the fact that the decedent had this alcoholic blood content." In answer thereto he stated:
"In my opinion, it could not have happened because there is certainly no reason why anybody who operates a Centrifuge would poke something into the Centrifuge."
Appellant contends that the petitioner failed to establish (1) that the accident resulting in decedent's death arose out of and in the course of his employment and, furthermore, (2) that it had established that decedent's intoxication was the natural and proximate cause of the death thereby barring recovery under the express provisions of R.S. 34:15-7. It asserts that neither petitioner, the Deputy Director nor the *347 court "has offered or reached any explanation for the occurrence. * * *" It adds: "Were the accident susceptible of any rational explanation, except the obvious one of drunkenness, the within appeal would not have been prosecuted." Defendant, therefore, contends that the judgment of the County Court should be set aside. We are not in accord.
It is an inescapable conclusion from the evidence that decedent's death was caused by the fact that his chest was crushed by a piece of lumber broken by the whirling centrifuge and propelled with great force against his body. The single unsolved question is how the lumber came in contact with the operating machine so that a section of it was wedged in the slurry, part became broken, struck and killed decedent, and was hurled for a distance of 6 to 12 feet outside of the shed.
We determine that the accident arose in the course of decedent's employment with appellant. He was where he was supposed to be at the time of the accident and the machine which he was assigned to operate was still running when he was found prone and dying beside it. The accident occurred while he was doing the very task which he was required to do, namely operating the machine. Bryant Adm'x. v. Fissell, 84 N.J.L. 72 (Sup. Ct. 1913); Belyus v. Wilkinson, Gaddis & Co., 115 N.J.L. 43, 47 (Sup. Ct. 1935), affirmed 116 N.J.L. 92 (E. & A. 1936).
We are satisfied, also, that the accident arose out of decedent's employment. Appellant contends that the accident did not so arise because, as the piece of lumber was found in the machine, an "inescapable inference" arises that it must have been placed there by decedent while intoxicated. If so, appellant concludes decedent was not doing that which as a centrifuge operator he might "reasonably do."
In its attempt to support its contention that decedent's death was caused by intoxication, appellant asserts that if the degree of intoxication "had been less than .10 per cent the decedent would not have done what he did"; had it been over .25 per cent he would "probably have been incapable *348 of lugging the timber one thousand feet and physically inserting it into the machine"; that such acts "compel the conclusion that this was neither a momentary departure nor a reasonable example of normal human conduct"; that the death had its genesis in decedent's "desire to perform a bizarre or wanton act." It poses the questions: "what conceivable connection did the insertion of a plank * * * into a centrifuge have with the decedent's work?" and "Who but a drunk would do such a thing?" It adds that the petitioner "has neither answered nor sought to answer either question  all by law within her obligation to explain and prove."
These statements embody assumptions which are pure conjecture. There is no proof that the plank, just prior to it being brought to the clay shed, had been "a fifth of a mile away"; no proof that decedent obtained the plank at such a distance; no proof that he carried it for that distance to the clay shed, or that he brought it to the shed from any place; no proof that he inserted the plank into the machine; or that, if he did so, the effects of intoxication dominated his act. Assuming that he did bring the plank to a position where it came into contact with the whirling mechanism it may well be that it was an attempt on his part (even though unwise and indiscreet) to use the plank in connection with some phase of the centrifuge operation. This could have occurred despite the fact that those familiar with the operation were unable to ascribe any need for the use of the plank in connection with the normal operation of the machine.
We hold that it is not the burden of petitioner to prove how the lumber found its way into the machine. The death flowed from the machine operation.
Appellant relies heavily on Nardone v. Public Service Electric & Gas Co., 113 N.J.L. 540 (Sup. Ct. 1934). There an employee was found dying near a high chimney. He had been struck on his head by some unidentified object. It was urged that it might have been caused by a brick becoming dislodged and falling from the chimney. The *349 evidence showed that no brick was missing from the structure and petitioner was denied recovery. Appellant, in commenting on Nardone, asserts in its brief that "the result left the actual cause of death, even though traumatic, unexplained." In the case at bar no doubt exists as to the cause of death. The evidence irrevocably compels the conclusion that Olivera was killed by a piece of lumber propelled by the moving machine. He was not struck by an unidentified object as in Nardone. Unexplained only is how and under what circumstances the lumber came in contact with the moving apparatus. In passing, morever, it should be noted that in Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304, 308 (App. Div. 1953), Judge Bigelow, referring to Nardone, said: "We are satisfied that the decision does not accord with the great majority of the reported cases of our higher courts, and that it should not be followed in the case now before us." This court in Macko recognized (24 N.J. Super. at page 307), that in those cases where death of an employee occurred before he had an opportunity to give his version of the accident, the courts are satisfied with "very scanty circumstantial evidence that the accident arose out of, and in the course of, the employment," citing Tully v. Gibbs & Hill, 12 N.J. Misc. 275 (Sup. Ct. 1934).
It is recognized that the mere finding of a decedent's body at a place of his employment where he had a right to be does not raise an inference as to how the death occurred or that it was a risk connected with the fulfillment of the employee's contract of service. Such a case was Dietz v. Eagle Grocery Co., 14 N.J. Misc. 240 (W.C.B. 1936) (not officially reported) and Bowen v. Olesky, 20 N.J. 520 (1956). But here the accident was related to his employment, i.e., the operation of the centrifuge. The fact that the lumber would not have any function in the ordinary operation of the machine is not destructive of petitioner's claim. She should not be denied recovery because a foreign object by some unexplained means became lodged in the machine.
*350 Appellant resists petitioner's claim primarily on the statutory ground that intoxication was the natural and proximate cause of decedent's death. To succeed in defeating petitioner's compensation claim on the basis of decedent's alleged intoxication appellant must under the decisions in this State establish by the greater weight of the evidence that intoxication was the sole producing cause of death. In Kulinka v. Flockhart Foundry Co., 9 N.J. Super. 495 (Cty. Ct. 1950), affirmed sub nomine Bujalski v. Flockhart Foundry Co., per curiam and substantially on opinion below, 16 N.J. Super. 249 (App. Div. 1951), certification denied 8 N.J. 505 (1952), the court, interpreting the applicable statute, R.S. 34:15-7, said at 9 N.J. Super. 504, 505:
"Fundamentally, therefore, the right to compensation here depends upon the determination of the issue of intoxication. Has the respondent shown by the preponderance of all of the evidence in the record that Kulinka's intoxication was `the natural and proximate cause' of his injury?
The article `the' in this statutory context is a word of exclusion. It means that in order to defeat recovery the employer must show by the greater weight of the evidence that the employee's injury was produced solely by his intoxication. In other words, the employment must supply no more than the setting, the stage, the situation in which the fall occurred; it can be no more than an inactive condition as distinguished from a moving cause. If the hazards or risks which are incidental to the employment concur with the employee's insobriety in producing the fall or if the hazards or risks contribute efficiently to the production of the fall, compensation cannot be denied. If the Legislature intended intoxication as a concurrent or contributory cause of an injury to effect a deprivation of the benefits of the statute it would have been a simple matter to have said so."
In O'Reilly v. Roberto Homes, Inc., 31 N.J. Super. 387, 393 (App. Div. 1954), we said:
"Thus the New Jersey rule today is that the employer must show intoxication as a cause to the exclusion of all others. * * *
The employer must show intoxication as the sole and proximate cause of the injury and it is not enough that the condition of the worker was a contributing factor in bringing about the accident. Van Note v. Combs, 24 N.J. Super. 529, 532 (App. Div. 1953)."
*351 In O'Reilly, involving an automobile accident on the highway, the court said (31 N.J. Super. at page 393):
"* * * The toxicologist report showed alcoholic content in the brain to be `.1965 per cent, which is equivalent to 1.965 gram of alcohol per kilogram of brain.' According to the weight of the testimony, such a percentage of content may produce a state of intoxication which would affect different people and drivers in varying degrees.
The exact cause of the accident in the present case is open to mere speculation since there are no witnesses to the accident."
See also Schultz v. Henry V. Vaughans Sons & Co., Inc., 24 N.J. Super. 492, 502, 503 (Cty. Ct. 1953).
Appellant attempts to distinguish O'Reilly and the other cases from the one at bar by the contention that the "weight of the plank, its original location 1,000 feet away, and the requisite that it be physically inserted into the centrifuge, requires activity and not passivity." Aside from making the assumption that decedent was responsible for transferring the plank the indicated distance the contention assumes that the contact between the plank and the machine was due to decedent's intoxication rather than to a conscious act on his part stemming not from intoxication but from an injudicious maneuver.
Appellant contends that the "positional risk" doctrine or the "if but for the employment" doctrine is inapplicable to the case at bar. We reject this contention. We recognize the applicability of cases such as Howard v. Harwood's Restaurant Co., 25 N.J. 72 (1957); Pisapia v. City of Newark, 47 N.J. Super. 353 (Cty. Ct. 1957); Secor v. Penn Service, 19 N.J. 315 (1955); Gargiulo v. Gargiulo, 13 N.J. 8 (1953); Jochim v. Montrose Chemical Co., 3 N.J. 5 (1949); Belyus v. Wilkinson, Gaddis & Co., supra.
Appellant next urges that the Deputy Director erroneously excluded certain testimony proffered by it. This related to an attempt by appellant to introduce testimony by Mr. Brady the toxicologist as to behavior patterns of various individuals under the influence of alcohol. The law *352 grants wide discretion to a trial judge in determining the qualification of an expert witness. Monaco v. Jackson Engineering Co., Inc., 45 N.J. Super. 313, 317 (App. Div. 1957). We not only see no abuse of discretion but are in accord with the Deputy's ruling that proof on this phase of the case should come from medical experts rather than from a toxicologist. At a subsequent hearing precisely this course was pursued and both of the medical experts appearing for appellant gave testimony in this field. See also Locks Laboratories, Inc. v. Bloomfield Molding Co., 35 N.J. Super. 422, 428 (App. Div. 1955); Lawrence v. Tandy & Allen, 14 N.J. 1, 10 (1953); Remfer v. Deerfield Packing Corp., 4 N.J. 135, 141 (1950).
Finally appellant asserts that petitioner and the minor children were not full dependents. We find this contention without merit. Petitioner and decedent were married April 24, 1949. They resided together in Puerto Rico until 1953 when Olivera came to the United States to work. Petitioner was then pregnant. He sent money to her with reasonable regularity, usually $25 weekly. There is no proof that he abandoned his wife and children or ignored his obligation to support them. In Puerto Rico petitioner supplemented the family income by occasionally doing domestic work but that does not militate against a finding of full dependency. Fitzsimmons v. Federal Shipbuilding & Dry Dock Co., 4 N.J. 110, 114 (1950).
Affirmed.
CONFORD, J.A.D. (concurring).
I agree with the conclusion for affirmance, but for somewhat different reasons than those expressed by the court. I am satisfied that the employer did establish by the probabilities of the circumstances that Olivera put the plank in the centrifuge; but that controlling case law compels the legal conclusion that the accident nevertheless arose out of and in the course of the employment and that the factor of intoxication is not a defense in these particular circumstances.
*353 The factor of Olivera's alleged intoxication requires analysis in respect to both the ordinary aspects of the employment-connection of the accident and the statutory defense of intoxication. In both respects the respondent (in the Division) has the burden of proof as to the fact of the intoxication and its causal connection with the accident. Without here detailing the evidence, factual and expert, I am satisfied that the employer adequately established by a fair preponderance of the credible proofs that Olivera was under the influence of alcohol (not necessarily "intoxicated") when the accident happened. The next relevant factual inquiry is whether it was Olivera who placed the timber in the machine and whether his state of alcoholic stimulation had some causal relationship with his doing such an act. I am satisfied that the fair preponderance of the evidence requires affirmative responses to both of those questions.
The trial tribunals avoided the factual issue as to how the timber got into the centrifuge. I think it requires resolution on this record and that the justified conclusion is that Olivera put it there. The hypothesis that a fellow employee would do such a thing is not only extremely unlikely, theoretically, but derives no aid from the known surrounding circumstances. It is particularly unlikely that such an act could have been done by another without detection by Olivera. The dimensions of the plank and the machine preclude the idea that it could have been concealed inside the apparatus from the notice of the operator of the machine. There is utterly no basis in the evidence to suspect a sheer accident, as by the plank's falling into the centrifuge, unknown to the operator.
The exclusion of reasonably tenable alternative hypotheses improves the likelihood, in reason, of the theory that the decedent, his judgment and good sense impaired by liquor, inserted the plank in the machine under some such motivation as to facilitate disposal of the sludge or for some other fancied functional purpose, or on the momentary impulse of sheer curiosity as to what would happen. It is no answer *354 to these suppositions to say that none of them make sense, since it is not unheard of even for completely sober persons to do things at work which do not make sense, and this is of course more likely where the workman's good judgment is warped by drink.
It is to be kept in mind that we are not examining the a priori likelihood that Olivera would, for any of the reasons mentioned above, even if intoxicated, insert a plank in the centrifuge. We are here compelled to proceed from the reasonably justified assumption that someone did so, with the consequences mentioned in the court's opinion. The question is whether, on the preponderance of probabilities from all the known circumstances, in the common experience of mankind, the hypothesis of Olivera's agency in putting the plank in the machine outweighs in probability that of any other theory or combinations of theory. Jackson v. Delaware, L. & W.R. Co., 111 N.J.L. 487 (E. & A. 1933); Jochim v. Montrose Chemical Co., 3 N.J. 5 (1949). For me, that inquiry is susceptible of only an affirmative answer if we exercise objectively and conscientiously the independent function of weighing the evidence enjoined upon us by Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958). The combination of Olivera's control of the tiny room and the machine at and prior to the time of the accident, the size and shape of the timber in relation to that of the centrifuge, and the amount of alcohol in his blood conduce to the superior probability of the hypothesis of the physical cause of the accident tendered by the employer.
But this is as far as I can go with the appellant.
It is not claimed that Olivera's assumed act was one of willful self-injury. The presumption is against his having entertained any idea that he would get hurt by doing what he did. The accident is no less one arising in the course of and out of the employment because it was ill-advised, foolhardy, or the product of curiosity  if it was a human reaction to an impulse of the moment in respect to an object in or about the employment milieu, as I am satisfied it *355 probably was. See Secor v. Penn Service Garage, 19 N.J. 315, 321, 322 (1955), and the cases cited there. Reserving, for the time being, the matter of intoxication as a statutory defense, I see no reason, within the rationale of the line of cases approved in the Secor case, ubi cit., supra, to dilute their authority for recovery here by mere reason of the fact that the foolish, ill-advised or curious impulse was spurred by a degree of alcoholic stimulation. The taking of an occasional drink during working hours (not outright intoxication) is one of the human foibles which employers may expect in some of their workmen from time to time, along with many other kinds of accident-provoking weaknesses. Workmen's compensation recovery is intended by the Legislature to be geared to the realities of such diverse behavior as may be expected to be actually found among workmen, not what one might wish were ideally the case. Secor v. Penn Service Garage, supra (19 N.J., at page 324).
Turning to the question of intoxication as a defense per se under the statute, I am unable to find, preliminarily, that the degree of Olivera's subjection to alcoholic influence at the time of the accident is properly to be described as "intoxication," within the meaning of the statute. We know nothing about the extent of his alleged inebriety other than the percentage of alcohol to blood volume. He was found apparently sober by the foreman less than an hour before the accident. The effect of any given percentage of alcohol to blood in terms of aberration from normal behavior concededly varies in individuals. A lesser state of alcoholic stimulation than that contemplated by the workmen's compensation statute as "intoxication" could, in my judgment, well have caused Olivera to succumb to the preexisting psychological impulse to insert the plank in the centrifuge consequent upon any of the types of motivation mentioned above.
But even assuming that appellant has sustained its burden of establishing Olivera to have been intoxicated when the accident happened the statutory defense is still not made *356 out. It is by now settled that the statutory language, barring recovery where intoxication is "the natural and proximate cause of injury" means that the injury must be shown to have been "produced solely" by the intoxication, Kulinka v. Flockhart Foundry Co., 9 N.J. Super. 495, 505 (Cty. Ct. 1950) (Francis, J.C.C.), affirmed o.b., per curiam, sub nom. Bujalski v. Flockhart Foundry Co., 16 N.J. Super. 249 (App. Div. 1951), certification denied 8 N.J. 505 (1952); O'Reilly v. Roberto Homes, Inc., 31 N.J. Super. 387, 393 (App. Div. 1954); Kelly v. Hackensack Water Co., 23 N.J. Super. 88 (App. Div. 1952); Van Note v. Combs, 24 N.J. Super. 529, 532 (App. Div. 1953). Under the leading Kulinka case, supra, if the worker's intoxication concurs with another "moving cause" or hazard or risk of the employment to produce the injury, there is no bar to recovery. By analogy with the same reasoning, intoxication should not bar recovery if it requires for injurious effect the concurrence of a motivating impulse in the workman of a kind which, were it the sole cause of the injury, would not have legally precluded recovery. Just as meaningfully as in the Kulinka case, the intoxication in such a situation is not the sole producing cause of the injury. And this I find to be the case here. The assumed intoxication had to coexist with the incipient, equally contributive momentary impulse underlying the act of inserting the plank in the machine, whether it was curiosity or a foolhardy notion of using the plank for some work-purpose, before there could result the harmful overt act which here eventuated. Olivera's physical condition required concurrence with what I find, as a fact, to have been a psychological predisposition of a kind, which, if independently and exclusively productive of the same result, would nevertheless have permitted recovery as a matter of law. The state of intoxication (assuming its existence) was therefore not the sole proximate cause of the injury, and the statutory defense is not applicable.
I am in agreement with the disposition by the court of the remaining grounds of appeal.